853 F.2d 564
 26 Fed. R. Evid. Serv. 491
 UNITED STATES of America, Plaintiff-Appellee,
v.
Manuel HERRERA-MEDINA, Baltazar Herrera-Terrazas, Gustavo
Aguillar, Mateo Cano, Rodolfo Esparza-Corral,
Salvador Jacquez, Juan Rios, and Antonio
Salcido, Defendants-Appellants.
 Nos. 87-1335 to 87-1342.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 20, 1988.
Decided Aug. 2, 1988.
Rehearing and Rehearing En Banc Denied Sept. 9, 1988.
 
 John A. Meyer and Gregory J. Schlesinger, Chicago, Ill., for defendants-appellants.
 Jacqueline O. Stern, Asst. U.S. Atty. (Anton R. Valukas, U.S. Atty.), Chicago, Ill., for plaintiff-appellee.
 Before CUMMINGS and POSNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 The eight appellants were tried together and found guilty of a variety of federal offenses arising from their participation in a major drug ring that smuggled heroin, cocaine, and marijuana from Mexico to Texas and then transported it to Illinois and Indiana for resale to consumers. They received prison sentences ranging from three and a half years to eighteen years. They raise a variety of issues, but most either have no possible merit or are foreclosed by circuit precedent (notably the issue of the validity of the indictment, an issue decided in United States v. Taylor, 841 F.2d 1300 (7th Cir.1988), against the position taken by the appellants here) and hence require no discussion. Modern judicial opinions tend to be too long, and we shall try to be brief. We shall even forgo the usual prefatory statement of facts, which would disclose an utterly routine, though very large, illegal drug operation.
 
 
 2
 Baltazar Herrera-Terrazas complains about the sufficiency of the evidence to convict him, pointing out that although he had a close and continuing association with several of the conspirators--notably Jesus Herrera, the kingpin of the operation--this was only natural since Baltazar was a cousin of Jesus Herrera and it was a close-knit family. And while each of the other defendants was identified by a government informant as a participant in the drug ring, no informant testified that Herrera-Terrazas had been a participant. Nevertheless there was a good deal of indirect but cumulatively persuasive evidence of his participation. He was seen talking to the driver of a white truck, laden with illegal drugs, that left El Paso for points north and en route was seized by government agents, and he was also seen both following the truck and inspecting it. And during this period he met repeatedly with other members of the ring. Videotaped and wiretapped telephone conversations revealed him discussing the shipment with other members of the ring and also reveal that he was dispatched to Chicago, apparently to receive the shipment when it arrived. In one conversation he told Jesus Herrera that there were "fifty-seven rolls"--and when the truck was seized, it was found to contain 57 bales of marijuana. There was enough evidence to convict Herrera-Terrazas beyond a reasonable doubt, and the evidence against the other appellants was even stronger.
 
 
 3
 He argues, however, that the intercepted conversations should not have been played to the jury in their entirety, because they were for the most part "idle chatter" and "war stories," which showed that he was familiar with drug trafficking and had participated in it in the past but not that he had had anything to do with the transactions for which he was indicted. For example, the tapes revealed him and Jesus Herrera talking at length about smuggling marijuana across the Mexican border by using furniture to conceal the bags of marijuana and spices to conceal its smell, but none of the marijuana seized in connection with the transactions charged in the indictment involved the use of furniture or spices. And most of the talking was done by Jesus Herrera--Baltazar's role being that of the great man's admiring flunkey. The evidence was admitted on the ground that it was relevant to Baltazar's "state of mind."
 
 
 4
 We think the evidence was properly admitted, although the ground of admission may be questioned. The evidence was not hearsay; it was not being used to show that the war stories were true. See Fed.R.Evid. 801(c). It was being used to show that Baltazar was an intimate of the drug kingpin, that he was familiar with the drug trade, and that the kingpin trusted him. These facts enhanced the probability that Baltazar's accompanying and inspecting the white truck, his trip to Chicago, the reference to the "fifty-seven rolls," etc., were not coincidences emanating from an innocent familial association with participants in the enterprise; he was himself a trusted participant.
 
 
 5
 The only question is whether the probative value of this evidence was substantially outweighed by the danger that it might prejudice the jury against Herrera-Terrazas. See Fed.R.Evid. 403. That was a question for the trial judge, who took it seriously and instructed the jury to disregard the irrelevant portions of the tapes. The efficacy of such instructions may of course be questioned, but as Baltazar's attorney did not object to the limiting instruction at trial, the only question is whether we can conclude that the instruction must have been so inefficacious that the judge's failure to exclude the tapes rather than limit the permissible use of them was a plain error; we cannot so conclude.
 
 
 6
 Several of the appellants object to the trial judge's refusal to allow Ortega, a key government witness, to be recalled for further cross-examination concerning money that he had received from the government for his cooperation. The original cross-examination brought out that he and his girlfriend had been promised a total of $60,000 for testifying in this trial and that he had received another $85,000, making a total for the two of them of $145,000 over a four-year period of investigation and trial. The government refused to supply the defense with payment records showing the breakdown of the $145,000 between expense reimbursement and reward, on the ground that it would be merely cumulative evidence regarding the credibility of Ortega's testimony. The trial judge sustained the refusal.
 
 
 7
 The more the government paid Ortega and his live-in girlfriend for Ortega's testimony, the greater his incentive to lie for the government; and as money that merely reimbursed him for expenses connected with his work for the government--business expenses, as it were--would not operate as an inducement, naturally the defendants wanted to know how much of the $145,000 was expense reimbursement and how much reward, rather than letting the jury speculate that most of it might be reimbursement. However, the district court's discretion in controlling the extent of cross-examination is broad. United States v. Wisniewski, 741 F.2d 138, 142 (7th Cir.1984). For cross-examination has no natural limits, and the trial judge must therefore exercise judgment in deciding when the point of diminishing returns has been reached, or passed--a judgment that will depend on the particulars of each case, and on such unreviewable imponderables as the judge's assessment of the jury's comprehension and attention span. United States v. Salsedo, 607 F.2d 318, 321 (9th Cir.1979), upheld a ruling that limited an informer's testimony in much the same manner as here.
 
 
 8
 If the judge's ruling was error, it was a harmless one. First, we know that at least $60,000 was reward; second, no evidence was presented that Ortega had in fact incurred any expenses working for the government; third, the government did not contend in closing argument that any of the money was for expenses; fourth, much other impeaching evidence was admitted--showing for example that Ortega was an illegal alien whom the government was protecting from being deported, that he had continued using drugs, that his girlfriend had had a child by one of the Herreras, and that he was not paying any taxes. The jury could have been under no illusion that he was a choir boy; he was singing for pay and to avoid prosecution and deportation.
 
 
 9
 We have considered whether the error, if any, was harmless, because that is the conventional approach in reviewing challenges to evidentiary rulings at trial. Yet it might be more sensible to fold the issue of harmlessness into that of error. Whether the judge was right to curtail cross-examination depended in significant part on whether the evidence thereby excluded would have helped the defendant. If not, its effect in confusing the jury or wasting time would substantially outweigh its probative value, and it would have to be excluded. See Fed.R.Evid. 403.
 
 
 10
 Another way of approaching the issue of the government's failure to show the defendants the records of payments to Ortega is via Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), which requires the government to show a criminal defendant exculpatory material in its files upon the defendant's request for such materials. There was such a request here; and the principle of Brady extends to materials that would tend to exculpate the defendant by undermining the credibility of a government witness. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); United States v. Kehm, 799 F.2d 354, 358 (7th Cir.1986). But the defendants have forfeited any argument based on Brady by failing to argue it in this court. They cite Brady in passing, but they do not make a Brady argument; they argue only that the district judge unduly curtailed the scope of cross-examination. Yet had they made the argument, it would have failed. The only evidence required to be disclosed under Brady is evidence that is "material" in the sense that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, supra, 473 U.S. at 682, 105 S.Ct. at 3383. That condition is not satisfied here, for reasons explained earlier in discussing whether the judge's ruling, if error at all, was harmful.
 
 
 11
 One final point on the payment records. At argument the government's counsel claimed not to know how much of the $145,000 was in fact reimbursement for expenses. She said that the Drug Enforcement Agency hadn't told her. Perhaps not. But it is one government, and its counsel should come to an oral argument in this court prepared to supply all information material to our consideration of the appeal.
 
 
 12
 The only other issue that merits discussion concerns the government's refusal to grant immunity to defense witnesses, notably Nicholas Cano, the brother of defendant Mateo Cano. Mateo wanted to call Nicholas to testify that Mateo's trips to Mexico and eventual relocation to Denver were in connection with family concerns rather than, as the government's evidence indicated, illegal transactions in drugs. On advice of counsel, Nicholas refused to testify, fearing that his testimony might incriminate him. The government refused to immunize him, so he didn't testify, and Mateo lost the benefit of his testimony.
 
 
 13
 There are really three separate questions. The first is whether there was sufficient danger of self-incrimination to justify Nicholas Cano's refusal to testify. The second is whether, if so, the judge could and should have granted him immunity for his testimony. The third is, if not, whether the government's refusal to immunize Nicholas Cano denied Mateo Cano due process of law.
 
 
 14
 1. Nicholas Cano had been indicted as a participant in the Jesus Herrera drug ring, but the indictment had been dismissed. Nevertheless the statute of limitations had not run, so Nicholas could have been reindicted on the basis of his testimony at Mateo's trial. Mateo argues that Nicholas's testimony about their family concerns would not have been incriminating, but that is not the point. Had he testified for the defense he would have opened himself up to broad-ranging cross-examination by the prosecution. For having decided to testify, a witness cannot assert the Fifth Amendment privilege with respect to specific questions if they are within the scope of his testimony; he cannot deprive the opposing party of the right of cross-examination. Brown v. United States, 356 U.S. 148, 155-56, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958); Jenkins v. Anderson, 447 U.S. 231, 236 n. 2, 100 S.Ct. 2124, 2128 n. 2, 65 L.Ed.2d 86 (1980); United States v. Kimberlin, 805 F.2d 210, 237 (7th Cir.1986); Neely v. Israel, 715 F.2d 1261 (7th Cir.1983). On cross-examination by the government Nicholas would have been asked about his participation with his brother in the Herrera drug ring and might well have been incriminated by his answers. His fear of self-incrimination was hardly "fanciful." In re Corrugated Container Antitrust Litigation, 661 F.2d 1145, 1150 (7th Cir.1981), aff'd under the name of Pillsbury Co. v. Conboy, 459 U.S. 248, 103 S.Ct. 608, 74 L.Ed.2d 430 (1983); id. at 266 n. 1, 103 S.Ct. at 618 n. 1 (concurring opinion); In re Folding Carton Antitrust Litigation, 609 F.2d 867, 871 (7th Cir.1979) (per curiam); cf. United States v. Silverstein, 732 F.2d 1338, 1346 (7th Cir.1984).
 
 
 15
 2. The prevailing view, certainly in this circuit, is that federal courts do not have the power to grant immunity to a witness. See, e.g., United States v. Wilson, 715 F.2d 1164, 1173 (7th Cir.1983); United States v. Bounos, 693 F.2d 38, 39 (7th Cir.1982); United States v. Pennell, 737 F.2d 521, 527-28 (6th Cir.1984); United States v. Hunter, 672 F.2d 815, 818 (10th Cir.1982); United States v. Benveniste, 564 F.2d 335, 339 n. 4 (9th Cir.1977); contra, Government of Virgin Islands v. Smith, 615 F.2d 964, 979 (3d Cir.1980); in between (implying perhaps that judges are not bound by the logicians' Law of the Excluded Middle), United States v. Eagle Hawk, 815 F.2d 1213, 1217 (8th Cir.1987). Immunity is an executive prerogative. "No court has authority to immunize a witness. That responsibility ... is peculiarly an executive one." Pillsbury Co. v. Conboy, supra, 459 U.S. at 261, 103 S.Ct. at 616; see also United States v. Doe, 465 U.S. 605, 616, 104 S.Ct. 1237, 1244, 79 L.Ed.2d 552 (1984). But we have left open the possibility that--
 
 
 16
 3. In an appropriate case the refusal of the government to immunize a defense witness might be at once so damaging to the defense and so unjustifiable in terms of legitimate governmental objectives that the refusal to grant immunity would be a denial of due process of law to the defendant, and preclude his conviction. See, e.g., United States v. Taylor, 728 F.2d 930, 935 (7th Cir.1984); United States v. Patterson, 819 F.2d 1495, 1506 (9th Cir.1987); United States v. Lord, 711 F.2d 887, 891-92 (9th Cir.1983). Suppose the government had no intention of prosecuting a witness, but, wanting to deprive the defendant of that witness's testimony, threatened the witness with prosecution, at the same time refusing to grant immunity. Tactics so sharp might require dismissal of the indictment, provided the witness's testimony was important to the defense--though we know of no case that has actually been dismissed on this ground. Anyway, if there is such a principle, Mateo Cano has made no attempt to bring himself within it.
 
 
 17
 We have examined the other issues with due care, but find no merit in them and no reason to publish an analysis of them. The judgments are
 
 
 18
 AFFIRMED.