**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Heriberto DIAZ, Yvette Huertas and**
**Wilfredo Mojica,**
**Defendants–Appellants.**

**Nos. 88–1772, 88–1807 and 88–2286.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1988.

Decided June 9, 1989.

Gary Ravitz, Bradley Harris, Ari M. Trubitt, Mitchell D. Kreiter & Associates, Chicago, Ill., for defendants-appellants.

Anton Valukas, U.S. Atty., Chicago, Ill., David J. Stetler, Chief, Victoria J. Peters, Deputy Chief, Andrea L. Davis, Zaldwaynaka L. Scott, Asst. U.S. Attys., Criminal Receiving and Appellate Div., for plaintiff-appellee.

Before COFFEY, MANION and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Heriberto Diaz, Yvette Huertas and Wilfredo Mojica appeal their convictions on charges of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846, and of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). We affirm.

## I

## FACTS

Heriberto Diaz, Yvette Huertas and Wilfredo Mojica were subjects of a three count indictment charging each of them with one count of conspiracy to possess with intent to distribute and distribute cocaine, as well as another count of possession of cocaine with intent to distribute. These indictments stemmed from drug arrests that took place on September 11, 1987, in Chicago, Illinois.[1]

The events began with an August 27, 1987, drug transaction between co-conspirator William Contreres and Drug Enforcement Administration (DEA) Agent Randy Clifton.[2] On that date, Agent Clifton, who was acting in an undercover capacity, was seated in a vehicle outside the Los Sombreros Lounge at 3934 West Division Street in Chicago, Illinois. Accompanying Agent Clifton in the automobile was a DEA confidential informant, Angel Ortega. While Clifton and Ortega were seated in the automobile, co-conspirator William Contreres and one Jorge Cerrano approached the driver's side window. Contreres advised Agent Clifton that the cocaine would arrive shortly. Clifton gave Contreres the number for the pager which he carried and instructed Contreres to contact him when the cocaine was delivered. Special Agent Clifton and Ortega departed the area. Approximately 20 minutes later, Contreres and Cerrano paged Agent Clifton, and Clifton and Ortega returned to the Los Sombreros Lounge.

Upon the arrival of Clifton and Ortega, Contreres and Cerrano again approached Clifton's automobile. Contreres told Clifton that the cocaine had arrived and instructed Clifton to drive one block west to the parking lot of an Amoco gas station where the narcotics transaction would be

1. A co-defendant, William Contreres, was charged in the same two counts. Contreres was also charged in an additional count of the indictment with distribution of cocaine arising from an August 27, 1987, sale to a DEA agent. Contreres ultimately pled guilty and, thus, did not stand trial with the remaining three defendants. Nonetheless, evidence of Contreres' August 27, 1987, drug transaction was admitted, without objection, at the defendants' trial.

2. Confidential Informant Ortega had introduced Contreres to Agent Clifton for the purpose of arranging a cocaine transaction.

completed. After arriving at the parking lot, Contreres entered the back seat of Clifton's car, while Cerrano remained outside. Contreres reached inside his coat pocket and handed Clifton a plastic sandwich bag containing approximately one ounce of cocaine. Clifton gave Contreres $1,300 in United States currency. Prior to leaving Clifton's automobile, Contreres told Clifton that he could supply Clifton with larger quantities of cocaine. Clifton asked Contreres if he could supply "kilogram quantities," to which Contreres replied, "No problem."

The cocaine transaction that resulted in the appellants' arrests and prosecutions occurred less than two weeks later. On or about September 9, 1987, Confidential Informant Ortega received a telephone call from Contreres, in which Contreres told Ortega that he had a kilogram of cocaine ready for delivery to Agent Clifton. A purchase price between $21,000 and $23,000 was discussed.

Two days later, during the late morning hours of September 11, 1987, Ortega received another telephone call from Contreres. Contreres again stated that he was ready to deliver one kilogram of cocaine, and inquired concerning the delay in the transaction. Ortega gave Contreres a DEA telephone number, and Contreres agreed to call Ortega at that number later on the same day.

Subsequently, Contreres made two telephone calls to Ortega at the DEA office. In the first call, Contreres told Ortega that the kilo of cocaine was ready and that Ortega should meet him at 1:00 p.m. that afternoon at the corner of Pulaski and Armitage in Chicago, Illinois to execute the drug transaction. In the second phone call, Ortega told Contreres that they would arrive a little later than planned, but that they would be there.

Clifton and Ortega then drove to the designated location, followed by DEA agents who established surveillance in the vicinity. When Clifton and Ortega arrived at the corner of Pulaski and Armitage, they were met by Contreres and an unidentified male. Contreres approached the window of Clifton's vehicle and instructed Clifton to drive one block south on Pulaski where they would meet in a parking lot located across the street from a fire station.

Contreres and the unidentified male then got on a red motorcycle, and drove to the parking lot followed by Clifton and Ortega. Upon arriving at the parking lot, Contreres again approached Clifton's car. Contreres informed Clifton that Clifton had missed the cocaine delivery because he was late, that a telephone call would need to be made to arrange for redelivery of the cocaine, and estimated that it would take approximately one-half hour for the cocaine to arrive.

Confidential Informant Ortega then left the vehicle, while Agent Clifton remained inside. Ortega, Contreres and the unidentified male entered a house located at 1739 North Pulaski, which was directly across the street from the parking lot where Agent Clifton was parked. The house was later identified as the residence of defendant Wilfredo Mojica. Upon arriving at Mojica's residence, Contreres advised Mojica, who was in the bathroom, that the person with the money for the cocaine was now present. Contreres introduced Mojica to Ortega when Mojica left the bathroom. Mojica told Ortega that he would call the individual who could deliver the cocaine on that person's paging device, and proceeded to dial a telephone number.

The unidentified male who had accompanied Contreres on the red motorcycle left the residence and approached Clifton's car. He told Clifton to be patient, since the cocaine would arrive in about fifteen minutes. The male boarded the red motorcycle and proceeded north on Pulaski. Surveillance agents were unable to follow him. The unidentified male returned shortly thereafter, approached Agent Clifton's vehicle, handed Clifton a soda, and then left the area.

Subsequently, a red car arrived in front of Mojica's house. There is a conflict in testimony as to what transpired next. Agent Clifton, together with DEA Agent Oswaldo Amaro, who was conducting surveillance, testified that two individuals, la-

ter identified as defendants Heriberto Diaz and Yvette Huertas, exited the car and approached the residence.[3] In contrast, Huertas testified that she was not present on this occasion. Huertas' position was consistent with the testimony of Confidential Informant Ortega, who was in the house at the time, and who testified that he observed Mojica speaking only with Diaz. In that conversation Mojica informed Diaz of the presence of the person who had the money to purchase the cocaine and instructed Diaz to get the cocaine and return to the house. Diaz or both Diaz and Huertas (depending upon which version of the facts that is accepted) then left the residence. Upon leaving the area, Diaz pulled his vehicle into the parking lot where Special Agent Clifton was seated. Diaz then proceeded south on Pulaski, followed by surveillance agents who lost Diaz' vehicle in traffic.

A short time later, Diaz, this time undisputedly accompanied by Huertas, returned to Mojica's residence in his red car. Instead of parking his automobile in front of Mojica's house, Diaz turned the vehicle into an alley which ran between the dwelling and the fire station directly north of the residence and parked his car behind the house. Diaz and Huertas left the car and entered the garage. The overhead doors of the garage which faced the alley were open, enabling surveillance agents to observe that Huertas was carrying a black purse or bag. Huertas testified that Diaz had told her to carry the bag, that she had not seen the bag previously, that she was unaware of the bag's contents and had never before been to Mojica's residence.

Confidential Informant Ortega testified that Diaz and Huertas then entered Mojica's house through the rear door. Ortega further testified that Huertas was carrying the black bag as she entered the residence. In contrast, Huertas testified that she gave

the bag to Diaz while both were on the back porch of Mojica's dwelling, never entered the house and remained on the back porch. After Diaz and Huertas arrived, Contreres called to Ortega from the kitchen, telling Ortega to come to that room. Ortega testified that when he arrived in the kitchen, Diaz, Huertas, Mojica and Contreres were all standing around the kitchen table. Ortega walked over to the kitchen table. At that time, a package was removed from the black bag which Huertas had been observed carrying into the residence. The package was cut open and Ortega stated he observed what he believed to be cocaine. Ortega told the group that the cocaine looked satisfactory, that they should take the cocaine out to the car where Clifton was seated, and that Clifton would give them the money for the cocaine at the car. At least one of the defendants informed Ortega that the money was to be brought into the house.[4] Ortega and Contreres then left the house through the front door. Ortega remained on the sidewalk while Contreres approached Agent Clifton's car, advised Clifton that the cocaine had arrived and requested that Clifton bring the money for the cocaine into the residence. Ortega then displayed a pre-arranged arrest signal which informed surveillance agents that the cocaine was present in the residence. Upon observing Ortega's arrest signal, Clifton turned on the flashers of the vehicle which was an alternate arrest signal. Contreres was then placed under arrest.

At this time, agents began to converge on the residence to seize evidence and make other arrests. DEA Agents Richard Joyce and Oswaldo Amaro, who had been conducting surveillance near the rear of the property, entered the garage, saw Huertas running from the back of the residence into the garage and arrested her. Agent Amaro then observed defendants Diaz and Mojica leaving the house through

---

**3.** In addition, DEA Agent Leo Arreguin testified that when the red car drove away from Mojica's residence, both a man and a woman were inside.

**4.** In his direct testimony, Ortega asserted that Diaz made this statement. On cross-examina-

tion Ortega testified that Mojica made this demand and that Diaz made a similar assertion. In a statement dated September 17, 1987, that Ortega furnished the DEA, Ortega averred that Mojica had made the involved declaration.

the rear door. Diaz was carrying the black bag and Diaz and Mojica were attempting to put something into the bag. Agent Amaro commanded Mojica and Diaz to stop, but the two turned, ran back into the residence and locked the door. Amaro went to the rear door of the residence and was unsuccessful in attempting to force the door open.

Other DEA agents then approached the front door of the residence which was open. As the agents arrived at the door, it was closed by an unidentified individual. Agent Leo Arreguin knocked on the door, stated that the agents were police officers and requested that the door be opened. Agent Arreguin could hear a great deal of noise inside the house. Arreguin then forcibly opened the door, entered the residence and observed Mojica and Diaz. Mojica was standing in the living room area and Diaz was running up a flight of stairs in possession of the black bag.

Agent Arreguin apprehended Mojica. Arreguin testified on direct examination that he ordered Mojica to lie on the floor of the living room and did not touch Mojica. On cross-examination it was brought out that Agent Arreguin had testified in an earlier proceeding in this case that he grabbed Mojica and placed him on the floor. Following Mojica's arrest, Arreguin, together with other agents, went to the upper floor of the house in pursuit of Diaz. Upon reaching the second floor, Agent Arreguin observed Diaz in a bedroom seated near the foot of the bed and arrested him. Another DEA agent, Michael Hillebrand, proceeded to a second bedroom also on the same floor. When Hillebrand entered the room he observed an open black bag resembling a binocular case lying on the floor of a walk-in closet. Hillebrand noted that inside the bag was another bag that, in turn, contained a white powder substance later determined to be 1,000.75 grams of 86 percent pure cocaine.

At trial, defense counsel devoted a great deal of attention to matters relating to the credibility and possible bias of Confidential Informant Angel Ortega. The government itself introduced into evidence Ortega's complete DEA informant payment records. It was established through this evidence and through the cross-examination of DEA Agent Clifton that Ortega had received over $138,000 in payments from the DEA between 1982 and 1987 and had received $3,000 in connection with this case. These payments were made in cash and, to the best of Clifton's knowledge, Ortega had paid no taxes on this money. Testimony was also elicited from Clifton concerning individual rewards in the amounts of $15,000 and $10,000 that the DEA had paid Ortega. Agent Clifton further stated that Ortega turned in receipts for expenses on certain occasions, but confessed that he had not seen any of them.

Prior to Ortega's cross-examination, the government was granted a motion *in limine* precluding the defendants from cross-examining Ortega concerning income tax matters. Ortega was extensively cross-examined in a number of other areas. He noted that he came to this country illegally in 1972, had not been prosecuted and had been considered legally present since 1982, when he began to work for the DEA. He testified that his work with the DEA was his sole financial support, that he received rewards only when drug deals went through and that his rewards bore some relationship to the quantity of drugs confiscated. Ortega further acknowledged that he had received approximately $139,000 in payments from the DEA.

At the conclusion of the joint trial, the jury found the three defendants guilty of each of the charges brought against them. Defendants Huertas and Diaz were both sentenced to the five-year minimum prison term permitted under applicable law. In both cases the district court stated that a lower sentence would have been imposed had this been permissible under the relevant statutes. Defendant Mojica was sentenced to a seven-year prison term.[5]

5. Each defendant was also sentenced to a period of probation following the completion of their respective prison sentences.

Defendants Mojica and Diaz both challenge their convictions on the basis of limitations that the district court placed upon their cross-examination of government witnesses. Defendant Huertas asserts that the evidence was insufficient to support her convictions. She further claims that her convictions must be reversed because the district court erroneously rejected her pre-trial motions that had alleged improper joinder of defendants under Fed.R.Crim.P. 8(b) and sought severance under Fed.R. Crim.P. 14.

## II

### CROSS–EXAMINATION

Diaz and Mojica contend that various limitations placed upon their cross-examination of DEA Agent Clifton and Confidential Informant Ortega deprived them of their rights under the confrontation clause of the sixth amendment. Both Diaz and Mojica assert that the district court's grant of the government's motion *in limine* restricting their cross-examination of Ortega concerning tax matters violated the confrontation clause. Diaz further alleges that restrictions placed upon his cross-examination of Agent Clifton and Ortega regarding Ortega's submission of expense receipts to the DEA, the location of money Ortega received from the DEA and Ortega's immigration status were constitutionally impermissible.

In *United States v. Williams*, 858 F.2d 1218, 1223 (7th Cir.1988), we recently set forth the standards and policies relevant to claims that cross-examination restrictions violate confrontation clause rights:

" 'The confrontation clause promotes accuracy in the trial process by ensuring that the trier of fact has a satisfactory basis for evaluating the truth.' *Barker v. Morris*, 761 F.2d 1396, 1399 (9th Cir. 1985). The right to confront witnesses guarantees an opportunity for effective cross-examination, not cross-examination which is effective in whatever way and to whatever extent the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 18, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985). Trial judges retain wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety or interrogation that is repetitive or marginally relevant.' *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Thus, the sufficiency of cross-examination turns on 'whether the jury had sufficient information to make a discriminating appraisal of the witness' motive and bias.' *United States v. Rodgers*, 755 F.2d 533, 548 (7th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985)."

Our decision in *Williams* implements the approach the Supreme Court takes to confrontation clause claims. In *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), the Supreme Court held:

"We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' "

(Quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974)).

In applying the tests set forth in *Van Arsdall* and *Williams* we examine the limitations placed upon specific instances of cross-examination in the context of the entire case. "In order to determine whether the restrictions placed on the right to cross-examine a witness rise to the level of a constitutional deprivation, we 'look to the record as a whole ... and to the alternative means open to impeach the witness.' " *United States v. Cameron*, 814 F.2d 403, 406 (7th Cir.1987) (quoting *United States ex rel. Blackwell v. Franzen*, 688 F.2d 496, 500–01 (7th Cir.1982), *cert. denied*, 460 U.S. 1072, 103 S.Ct. 1529, 75 L.Ed.2d 950 (1983) (citations omitted)). We also recognize that

"the district court's discretion in controlling the extent of cross-examination is broad. For cross-examination has no natural limits, and the trial judge must therefore exercise judgment in deciding when the point of diminishing returns has been reached, or passed—a judgment that will depend on the particulars of each case, and on such unreviewable imponderables as the judge's assessment of the jury's comprehension and attention span."

*United States v. Herrera–Medina,* 853 F.2d 564, 566 (7th Cir.1988) (citation omitted). As we observed in *United States v. Robinson,* 832 F.2d 366, 373 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1739, 100 L.Ed.2d 203 (1988): "The trial court does not abuse its discretion when it precludes cumulative and confusing cross-examination into areas already sufficiently explored to permit the defense to argue personal bias and testimonial unreliability."

The record in this case reveals that the defendants were permitted to bring out significant information in each of the areas in which the court is alleged to have restricted the cross-examination. For example, on the subject of Ortega's taxes, the defendants elicited testimony from Agent Clifton that Ortega received significant cash payments on which, to Clifton's knowledge, no taxes were paid. Similarly, with respect to Ortega's immigration status, cross-examination revealed that Ortega came here illegally in 1972 and made clear that Ortega's DEA work had allowed him to remain in this country. Such information would clearly provide a basis for a defense argument that Ortega's testimony could be suspect because of his reliance upon his work for the DEA as his means of support as well as his basis for remaining in the United States. Some cross-examination was also permitted concerning the question of whether Ortega had filed expense receipts with the DEA. Finally, although testimony was not permitted concerning the country in which Ortega kept the money he received, this information bore little relationship to Ortega's credibility or bias. Diaz argued that the favorable exchange rate between the dollar and the Mexican peso meant that the money Ortega received would have been worth more to him if it were kept and utilized in Mexico. Like the trial judge, we question the relevance of this material and note that, in any event, evidence in the record that Ortega had spent substantial time in Mexico in the past few years, would be sufficient for a defense argument that Ortega likely received the benefit of this favorable exchange rate.

■ As in *Herrera–Medina,* a case involving the same confidential informant, we are convinced in this case that the trial judge, in setting the boundaries of the cross-examination of the government's witnesses, properly exercised his broad discretion "in deciding when the point of diminishing returns [had] been reached, or passed." 853 F.2d at 566. From our review of the record we are convinced that the trial judge was in the best position to determine, on the basis of the direct and the cross-examination he had previously permitted, that the various subjects on which cross-examination was allegedly restricted, had been "sufficiently explored to permit the defense to argue personal bias and testimonial unreliability." *Robinson,* 832 F.2d at 373. The judge could also properly decide that further examination in these areas would be repetitive, marginally relevant and result in confusion of the issues. *See Van Arsdall,* 475 U.S. at 679, 106 S.Ct. at 1435. In these circumstances we are satisfied that " 'the jury had sufficient information to make a discriminating appraisal of the witness[es'] motive and bias,' "[6] and that Diaz and Mojica have failed to demonstrate that they were "prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness[es], and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness[es].' " *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1436 (quoting *Davis,* 415 U.S. at 318, 94

**6.** *Williams,* 858 F.2d at 1223 (quoting *Rodgers,* 755 F.2d at 548).

S.Ct. at 1111). After hearing the defendants' cross-examination of Agent Clifton and Confidential Informant Ortega, "[t]he jury could have been under no illusion that [Ortega] was a choir boy; he was singing for pay and to avoid prosecution and deportation." *Herrera–Medina,* 853 F.2d at 566–67. Thus, neither Diaz nor Mojica have established a violation of the sixth amendment's confrontation clause.[7]

## III

### SUFFICIENCY OF THE EVIDENCE

█ Huertas contends that the evidence presented was insufficient to convict her of either conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846 or possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1).

"In evaluating [Huertas'] sufficiency of the evidence challenge, we note that [she] bears a heavy burden. Initially, we 'review all the evidence and all the reasonable inferences that can be drawn from the evidence in the light most favorable to the government.'" *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988) (quoting *United States v. Pritchard,* 745 F.2d 1112, 1122 (7th Cir.1984)). "The test is whether after viewing the evidence in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Pritchard,* 745 F.2d at 1122 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)).

"As we emphasized in *United States v. Giangrosso,* 779 F.2d 376, 382 (7th Cir.

1985): '[T]his court is not the trier of fact and we are required to uphold the jury's verdict where "any rational trier of fact" could have found the defendant guilty of the crime.' ... 'Only when the record contains no evidence, regardless of how it is weighed, from which the [trier of fact] could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict.' Nesbitt,* 852 F.2d at 1509 (quoting *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988) which quoted, in turn, *United States v. Moore,* 764 F.2d 476, 478 (7th Cir.1985)) (emphasis added)."

*United States v. Vega,* 860 F.2d 779, 793 (7th Cir.1988). "This [evidentiary standard] includes, in conspiracy cases, circumstantial as well as direct evidence." *United States v. Williams,* 858 F.2d 1218, 1221 (7th Cir.1988).

"A conspiracy is a 'combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.'" *United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985) (quoting *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983)). "Thus, the 'essential elements of a conspiracy under § 846 [of the Controlled Substance Act] are the existence of an agreement between two or more individuals, with the intent to commit an offense in violation of the Controlled Substance Act.'" *Nesbitt,* 852 F.2d at 1510 (quoting *United States v. Sweeney,* 688 F.2d 1131, 1140 (7th Cir.1982)). "Under a combination §§ 841(a)(1), 846 prosecution, the government must prove that defendant knew of the conspiracy to [possess

---

7. Although our holding that Diaz and Mojica were not deprived of their confrontation clause rights makes it unnecessary for us to resolve the question of whether any such deprivation might have constituted "harmless error," we note that the Supreme Court in *Van Arsdall* explicitly held that restrictions upon confrontation clause rights are subject to this analysis. 475 U.S. at 680–84, 106 S.Ct. at 1436–38. In conducting a harmless error analysis in the context of a restriction upon cross-examination, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless

say that the error was harmless beyond a reasonable doubt." *Id.* at 684, 106 S.Ct. at 1438. In light of the significant amount of cross-examination otherwise permitted on the question of Ortega's bias, we are convinced that the damaging potential of any additional cross-examination in this area would have been extremely limited. To hold otherwise would be pure speculation. Thus, if a confrontation clause violation existed, which it did not, it would have constituted harmless error. *See generally Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438 (Extent of cross-examination otherwise permitted is relevant to the question of harmless error).

with intent to distribute and to distribute] drugs and that [she] intended to join and associate [herself] with its criminal design and purpose." *United v. Griffin*, 827 F.2d 1108, 1117 (7th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1085, 99 L.Ed.2d 243 (1988). As we observed in *United States v. Xheka*, 704 F.2d 974, 988–89 (7th Cir.1983):

> "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict.... [M]ere association, knowledge or approval of a conspiracy is not sufficient to prove a defendant's guilt. However, while 'mere presence at the scene of the crime or mere association with conspirators will not themselves support a conspiracy conviction ... presence or a single act will suffice if the circumstances permit the inference that the presence or act was intended to advance the ends of the conspiracy.'"

(quoting *United States v. Mancillas*, 580 F.2d 1301, 1308 (7th Cir.), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978)) (citations omitted). As we noted in *United States v. Grier*, 866 F.2d 908, 924 (7th Cir.1989):

> "To convict a defendant of participation in a single conspiracy with other defendants, it is sufficient if it is established that:
>
> > '[t]he parties to the agreement were aware that others were participating in the scheme. The coconspirators must have "knowingly embraced a common criminal objective." *United v. Ras*, 713 F.2d 311, 314 (7th Cir.1983). However, there is no requirement that the participants in the plan "personally know the individuals involved ... [a]s long as the conspiracy continues and its goal is to achieve a common objective." *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.), *cert. denied*, [474] U.S. [818], 106 S.Ct. 63, 88 L.Ed. 2d 51 (1985) (citation omitted).'

*United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). Further, this court has held that ' "if each [defendant retailer] knew, *or had reason to know*, that other retailers were involved with the ... [drug kingpin's] organization in a broad project for the smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture, the jury *could find* that each had, in effect, agreed to participate in the overall scheme." *United States v. Baxter*, 492 F.2d 150, 158 (9th Cir.1973) (emphasis added).' *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985). In other words, '[if] the facts indicate that the defendant must have known something ... then a jury may be able to find beyond a reasonable doubt that he did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them. *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985).' *Cerro*, 775 F.2d at 911."

"Circumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *Vega*, 860 F.2d at 793. "Because conspiracies are carried out in secret, direct proof of agreement is rare." *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988) (citations omitted). As we observed in *Grier*, 866 F.2d at 923:

> " 'Not only is the use of circumstantial evidence permissible, but "circumstantial evidence 'may be the sole support for a conviction.' " ' *United States v. Nesbitt*, 852 F.2d at 1510 (quoting *United States v. Williams*, 798 F.2d 1024, 1042 (7th Cir.1986) (dissenting opinion) which quoted, in turn, *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)). ' "Circumstantial evidence is not less probative than direct evidence, and, in some cases is even more reliable." ' *Williams*, 798 F.2d at 1039 (dissenting opinion) (quoting *United States v. Andrino*, 501 F.2d 1373, 1378 (9th Cir.1974)). *See also Wisconsin Jury Instructions—Criminal, No. 170* ('[C]ircumstantial evidence may be stronger and more convincing

that (sic) direct evidence'). '[T]he evidence " 'need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.' " *United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) (quoting *United States ·v. Thornley,* 707 F.2d 622 (1st Cir.1983)).' *Koenig,* 856 F.2d at 854."

In weighing both direct and circumstantial evidence

"[j]uries are allowed to draw upon their own experience in life as well as their common sense in reaching their verdict. *See [United States v. Radtke,* 799 F.2d 298, 302 (7th Cir.1986) ]. While '[c]ommon sense is no substitute for evidence, ... common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence.' *Id.*"

*Nesbitt,* 852 F.2d at 1511. Not only do we recognize the jury's common sense, we also acknowledge the jury's role as the arbiter of credibility:

"[W]e defer to the jury's determination of witnesses' credibility. As we noted in *United States v. Ramirez,* 796 F.2d 212, 214 (7th Cir.1986): 'An appellate court will not weigh the evidence or assess the credibility of the witnesses.' Similarly, we have stated: ' "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather that question is left to the sound discretion of the trier of fact." ' *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.1984)). Finally, 'the credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances.' *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.1985)."

*Vega,* 860 F.2d at 794.

Evidence in the record clearly establishes the existence of a conspiracy to possess with intent to distribute and to distribute cocaine. Contreres' statements in connection with the August 27, 1987, cocaine sale to Agent Clifton demonstrated one conspirator's involvement in drug sales, and that conspirator's ability to deliver larger amounts of cocaine to a customer on later occasions. The attempted cocaine sale that took place on September 11, 1987, confirmed that others were involved with Contreres in the cocaine distribution operation. Two days prior to that date Contreres telephoned Ortega and discussed the drug purchase price with him. Telephone calls taking place on September 11, 1987, led to arrangements for delivery of the cocaine. Pursuant to the understanding reached in these calls, Contreres met Ortega and Agent Clifton in the company of an unidentified individual and brought them to a location near where the drug sale would take place. When Confidential Informant Ortega entered defendant Mojica's house, the involvement of others in the conspiratorial enterprise became evident. After Contreres informed Mojica of Ortega's arrival, Mojica telephoned another individual to effectuate the pre-arranged drug delivery. Thereafter, the first evidence of the involvement of Diaz and Huertas occurred when the two arrived at Mojica's door and Mojica spoke with Diaz. Diaz and Huertas later returned, with Huertas carrying a bag containing cocaine into Mojica's house. At that time each of the four named co-conspirators (Contreres, Mojica, Diaz and Huertas) stood with Ortega around Mojica's kitchen table as the cocaine was shown to Ortega and either Diaz, Mojica or both informed Ortega of the appropriate method for delivery of payment. Contreres then went to Agent Clifton to inform him of these payment arrangements. There can be no doubt that the operation just described constituted the "combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act," [8] necessary to establish a conspiracy.

The only question remaining is whether the evidence in the record also supported the jury's determination that Huertas knowingly and intentionally became part of the cocaine distribution conspiracy. *See*

---

**8.** *United States v. Mayo,* 721 F.2d 1084, 1088 (7th Cir.1983).

*Vega,* 860 F.2d at 795. As we have previously noted: "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between the defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka,* 704 F.2d 974, 988 (7th Cir.1983). Yvette Huertas performed several acts that, if knowingly and intentionally carried out, would clearly establish her involvement in the conspiracy. Huertas accompanied Diaz to Mojica's house at a point in time following the telephone call from Mojica that set in motion the involved cocaine delivery. After the first visit, during which Mojica spoke with Diaz, Diaz and Huertas returned to Mojica's house. On this occasion, Huertas carried the cocaine into Mojica's house and was present when Ortega inspected the cocaine and the parties discussed payment arrangements.

Huertas essentially contends that, even if the jury were to believe the evidence the government presented concerning her activities in the cocaine distribution operation, she did not knowingly and intentionally join the conspiracy because she acted at Diaz' direction, completely ignorant of her role as a courier in the drug distribution enterprise. Huertas did, indeed, testify at trial that she acted at Diaz' direction and was absolutely unaware of the fact that the bag she carried into Mojica's dwelling contained cocaine. But, the jury was not required to believe Huertas' self-serving assertions. As we noted previously: "The credibility of witnesses is particularly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances." *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.1985). Further, with respect to the question of knowing participation in a conspiracy, it is well settled that "[i]f the facts indicate that the defendant must have known something ... then a jury may be able to find beyond a reasonable doubt that [she] did know it, especially since the requirement of knowledge is satisfied by proof that the defendant willfully shut [her] eyes for fear of what [she] might see if [she] opened them, *United States v. Josefik,* 753 F.2d 585, 589

(7th Cir.1985)." *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985). A reasonable jury, presented with the government's evidence that Huertas went to a cocaine distribution house on two occasions, carried a bag containing cocaine into the house on the second occasion, watched as the prospective customer examined the cocaine and observed the parties' discussion of payment arrangements, could determine that Huertas was a knowing, willing and intentional participant in the involved conspiracy. In this case, the jury, having made appropriate credibility determinations and drawing reasonable inferences from the direct and circumstantial evidence it reviewed, through "exercising well-reasoned judgment could very well conclude that the inculpatory inferences outweigh the exculpatory inferences that could be drawn from the evidence beyond a reasonable doubt." *Nesbitt,* 852 F.2d at 1511.

For the same reasons, the evidence also supports the jury's verdict that Huertas knowingly and intentionally possessed cocaine with intent to distribute. Evidence was presented that Huertas carried a bag into the residence containing the cocaine to be sold to Clifton and Ortega. As was the case with respect to the conspiracy charge, a reasonable jury could have concluded from the evidence of Huertas' two visits to Mojica's house on September 11, her carrying of the bag containing cocaine into the house on that day, her presence when Ortega inspected the cocaine and her attendance as arrangements were made for payment of the cocaine that, at the very least, Huertas "willfully shut [her] eyes for fear of what [she] might see if [she] opened them." *Cerro,* 775 F.2d at 911.

Our conclusion that Huertas knowingly and intentionally participated in the cocaine distribution conspiracy and possessed cocaine with intent to distribute, despite Huertas' protestations to the contrary, finds support in previous cases in which we have recognized the jury's freedom, in weighing the evidence with which it is presented, to choose between interpretations of this evidence favorable to either the government or the defendant. In *Unit-*

*ed States v. Vega,* 860 F.2d at 796, we rejected the defendant's position that the jury was required to give a literal and, thus, innocent interpretation to the words "chickens," "roosters" and "it" that the defendant utilized in his conversations with drug dealers:

"Had the jury believed Vega, they could have permissibly interpreted terms like *'chickens,' 'roosters'* and *'it'* in a literal fashion and determined that Vega actually was interested in the purchase and sale of chickens. However, the triers of fact, who had the opportunity to observe the demeanor and character of all of the witnesses, chose not to believe this explanation. As has already been noted, there was no evidence that either Vega or the Zambranas dealt in chicken sales. Further, it is clear that a possible innocent explanation for Vega's conversations does not affect the validity of the jury's contrary conclusion."

Likewise, in *United States v. Zanin,* 831 F.2d 740, 745 (7th Cir.1987), we determined that a jury was free to choose between inculpatory and exculpatory interpretations of the involved recorded telephone conversations:

"Phyllis Zanin argues that all conversations in which she participated are susceptible to an innocent explanation. This may or may not be true—but it is irrelevant. The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt. The jury was entitled to draw reasonable inferences from the conversations. Phyllis Zanin often arranged for Julio Courbassier to get cash from the Zanin house to pay a third party; she expressed fear when she heard that her husband had been detained by federal agents at the airport and relief when he explained that they were not from the Drug Enforcement Agency; she warned her husband not to 'bring anything home' when she saw a police car near their home. In all, the jury was entitled to infer that Phyllis Zanin knew of her husband's activities and participated in them."

The government presented sufficient evidence upon which a rational jury could reasonably conclude that Yvette Huertas knowingly and intentionally participated in a conspiracy to possess with intent to distribute and to distribute cocaine and possessed cocaine with intent to distribute. Accordingly, we reject Huertas' sufficiency of the evidence claim.

## IV

### *JOINDER AND SEVERANCE*

Yvette Huertas further alleges that the trial court improperly denied her pretrial motions for relief from improper joinder under Fed.R.Crim.P. 8 and for severance under Fed.R.Crim.P. 14.

### A.

#### *Joinder*

When two or more defendants are involved in a joint indictment, our analysis of the joinder question proceeds under Fed. R.Crim.P. 8(b). *See United States v. Alvarez,* 860 F.2d 801, 823–24 (7th Cir.1988); *United States v. Moya–Gomez,* 860 F.2d 706, 766 (7th Cir.1988); *United States v. Velasquez,* 772 F.2d 1348, 1352–53 (7th Cir. 1985). *See also* 8 J. Moore, *Moore's Federal Practice* § 806[1] at 8–25 (2nd ed.) ("Rule 8(a) may be applied *only* to offenses joined against a single defendant, when more than one defendant is charged, Rule 8(b) must be applied.") (emphasis in original, footnote omitted). "Rule 8(b) allows charging in the same indictment two or more offenders only 'if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" *Moya–Gomez,* 860 F.2d at 766 (quoting Fed.R.Crim.P. 8(b)). Proper joinder of defendants, thus, "depends on the meaning of 'same series of acts or transactions.' The usual meaning is acts or transactions that are pursuant to a common plan or common scheme, which is to say (in the usual case) that the acts or transactions are parts of a single conspiracy." *Velasquez,* 772 F.2d at 1353 (citations omitted). As we have recognized: "It is well established that a conspiracy charge is a proper basis

for joinder under Rule 8(b)." *United States v. Garner,* 837 F.2d 1404, 1412 (7th Cir.1987). *Accord United States v. Bond,* 847 F.2d 1233, 1240 (7th Cir.1988) ("Randy [Bond] does not contest the propriety of the joinder under Fed.R.Crim.P. 8(b) and could not plausibly do so. All of the defendants were charged with this conspiracy, and a joint trial of coconspirators is presumptively appropriate"); *United States v. Dounias,* 777 F.2d 346, 348 (7th Cir.1985) ("Conspiracy charges ... can provide the bond that links the divergent substantive crimes into a single transaction for Rule 8(b) purposes").

"Proper joinder is determined from the face of the indictment." *United States v. Bruun,* 809 F.2d 397, 406 (7th Cir.1987). "Rule 8(b) only requires that the conspiracy be alleged-there is no requirement that the government demonstrate, at the pleading stage, sufficient evidence to support joinder." *United States v. Garner,* 837 F.2d 1404, 1412 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).

There is little doubt that Counts II and III of the indictment were properly joined, as both arise from the series of acts or transactions surrounding the attempted sale of cocaine to Agent Clifton on September 11, 1987. Huertas' main difficulty is with the joinder between these counts and Count I of the indictment that charged Contreres with distribution of cocaine in connection with the August 27, 1987, drug transaction with Agent Clifton.

The face of the indictment provides some support for Huertas' misjoinder claim. For some reason the conspiracy count of the indictment states that the conspiracy between Contreres, Mojica, Diaz and Huertas took place on September 11, 1987, and fails to allege that Contreres' August 27, 1987, delivery of cocaine to Agent Clifton was part of this conspiracy. This is not fatal. Rule 8(b) requires only that the joined acts or transactions be part of the "same series of acts or transactions," not that they be specifically alleged to be part of the same conspiracy. As we stated in *Velazquez,* 772 F.2d at 1353: "The indictment need not

charge a single overarching conspiracy, provided the separate conspiracies it charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy." As was revealed at trial, during the August 27, 1987, cocaine sale, Contreres and Clifton conversed about the possibility of bigger future cocaine sales, like that which was attempted on September 11. Upon this basis, there is a clear relationship between the two transactions demonstrating a common plan or scheme. Thus, these transactions were part of the same series of acts or transactions, and the August 27, 1987, incident was properly alleged in the same indictment as the September 11, 1987, incident. We thus hold that the argument alleging misjoinder is without merit.

■ Although we do not believe that there was misjoinder in this case, the Supreme Court has held "that an error involving misjoinder 'affects substantial rights' and requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). In *Lane* the Supreme Court relied upon the presence of instructions requiring the jury to consider each defendant separately, the likelihood that evidence relating to the misjoined count would have been admitted in a separate trial and the strong evidence of the defendant's guilt in concluding that the misjoinder was harmless. *See Lane,* 474 U.S. at 450, 106 S.Ct. at 732. In Huertas' case similar limiting instructions were given, evidence concerning Contreres' cocaine sale was admitted without objection in a trial separate from Contreres' and the totality of the evidence introduced against Huertas, as discussed previously, was clearly sufficient for a guilty verdict. In addition, two facts not present in *Lane* strongly support a harmless error determination in our case. First, as discussed previously, there was a clear relationship between the August 27, 1987, cocaine sale and the subsequent co-

caine sale in which Huertas was involved. Second, Contreres entered a guilty plea prior to Huertas' trial, which meant that Huertas was never involved in a joint trial with Contreres. The jury in this case was never called upon to resolve questions of guilt relating to the August 27 incident. Thus, it is beyond question that any technical misjoinder that could have occurred did not have a "substantial or injurious effect or influence in determining the jury's verdict" and would not require reversal of Huertas' conviction.

## B.

### *Severance*

■ "As the Supreme Court has said, 'once the Rule 8 requirements [are] met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14....' *United States v. Lane,* 474 U.S. 438, 447, 106 S.Ct. 725, 731, 88 L.Ed.2d 814 (1986) (interpreting *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960))." *United States v. Garner,* 837 F.2d 1404, 1412 (7th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). Huertas claims that her case should have been severed for trial under Rule 14 because of the disparity between the evidence against her and that against the other defendants, especially defendant Contreres.

In *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir.1988), we recently summarized the law we apply to the review of a district court's severance decision:

"Rule 14 permits the trial court in the exercise of its discretion to grant separate trials when the interests of justice so require. A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. Actual prejudice means that the defendant could not have a fair trial without severance, ' "not merely that a separate trial would offer him a better chance of acquittal." ' [*United States v. Peters,* 791 F.2d 1270, 1301 (7th Cir.), *cert. denied,* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986) ] (quoting *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977))."

(Footnote and citations omitted). "In considering a motion for severance, the trial judge should give deference to the 'strong public interest in having persons jointly indicted tried together, particularly where, as here, a conspiracy is charged and may be proved by evidence that arises out of the same act or series of acts.' " *United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985) (quoting *Papia,* 560 F.2d at 836–37). We explained the policy underlying this rule in detail in *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.1987):

"There is a strong interest in joint trials of those who engaged in a criminal enterprise. Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one or the other (or both) undoubtedly committed a crime. The joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome."

(Citations omitted).

"Denial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and [her] codefendants." *Moya–Gomez,* 860 F.2d at 765. But, "the fact that the evidence against [her] co-defendants might have been proportionally greater than the evidence against [her] is not itself grounds for a severance." *United States v. Hendrix,* 752 F.2d 1226, 1232

(7th Cir.1985). "In such situations, the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against [her]." *Moya–Gomez*, 860 F.2d at 765. "Juries, however, are presumed capable of sorting through the evidence and considering the cause of each defendant separately." *United States v. Williams*, 858 F.2d 1218, 1225 (7th Cir.1988). In this regard, the Supreme Court has observed: "To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions." *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954).

In the joint trial involving defendants Huertas, Mojica and Diaz, the trial judge gave the following instruction regarding separate consideration of each defendant:

> "Although the defendants are tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him."

Similarly, with respect to the conspiracy count, the district court instructed the jury that, "[i]n determining whether a defendant became a member of the conspiracy, you may consider only the acts and statements of that particular defendant." In light of the significant public benefits derived from a joint trial of three individuals alleged to have participated in a conspiracy that primarily revolved around events on a single day at a common location and the district court's provision of instructions that would allow a jury to consider the cases of each defendant separately, we believe that the trial court properly exercised its discretion in conducting a joint trial and that Huertas was not prejudiced by this determination.

Our decision accords with our resolution of previous cases involving allegations that disparities between the evidence against various co-defendants required separate trials. For example, in *Moya–Gomez*, 860 F.2d at 765, we noted that the trial court properly ordered a joint trial despite an allegation of a disparity in the evidence against co-defendants in a case in which "the trial court instructed the jury at several stages of the proceeding that it was to consider each defendant separately." Similarly, in *Zanin*, 831 F.2d at 744, a joint trial was permitted in a case in which the trial court gave instructions virtually identical to those given in this case. We observed:

> "Phyllis Zanin's argument is ... that the jury would impute guilt by association with her husband against whom the evidence was stronger. The court gave two limiting instructions. The first was general, explaining that each defendant's guilt must be determined separately. The second related solely to conspiracy and explained that to find a defendant guilty of conspiracy, only the acts and statements of that particular defendant may be considered. The jury acquitted Phyllis Zanin of conspiracy while convicting her husband of the same offense. It is plain that the jury was able to follow the limiting instruction and that Phyllis Zanin was not deprived of her right to a fair trial by the court's denial of her motion to sever."

Although we believe that the limiting instructions provided the jury were in themselves sufficient to protect Huertas from any prejudice accompanying a joint trial, we note two other factors reflecting an absence of prejudice. First, evidence of the other defendants' conduct, taking place at roughly the same time and location as Huertas' activity, would in all probability have been admissible in a separate trial of Huertas for conspiracy and possession with intent to deliver. Thus, a separate trial would not have differed significantly from a joint trial in terms of the prejudice resulting to Huertas from evidence of her co-defendants' activities. *Cf. Moya–Gomez*, 860

F.2d at 768 (" 'In those instances where evidence of one crime is admissible at a separate trial for another, it follows that a defendant will not suffer any additional prejudice if the two offenses are tried together' ") (quoting *United States v. Foutz*, 540 F.2d 733, 736 (4th Cir.1976)) (footnote omitted). Second, the fact that the government presented evidence clearly sufficient to convict Huertas of both crimes, renders it extremely unlikely that Huertas was prejudiced by a joint trial. *See Moya–Gomez*, 860 F.2d at 754–55 ("Celestino's contention that he was entitled to a severance is based on his belief that the evidence was insufficient to convict him of the CCE charge.... We already have held, however, that the evidence was sufficient to convict Celestino of managing a CCE. Accordingly, Celestino's argument that he was prejudiced by the joinder is without merit").

Huertas has failed to demonstrate prejudice resulting from her joint trial with co-defendants Diaz and Mojica. Although Huertas also alleges prejudice resulting from evidence relevant to the activities of Contreres, it is obvious that any such prejudice cannot be attributed to the district court's severance decision because Huertas was not, in fact, tried jointly with Contreres.[9] Thus, the district court properly exercised its discretion in rejecting Huertas' severance motion.

The jury's verdict against Huertas was based upon sufficient evidence and the trial court judge did not commit reversible error. Therefore, the convictions of Diaz, Mojica and Huertas are

AFFIRMED.

---

9. It is also interesting to note that Huertas did not object to the admission of evidence at her trial concerning Contreres' conduct in connection with either the August 27, 1987, cocaine sale or with the September 11, 1987, attempted cocaine sale.