UNITED STATES of America,
Plaintiff–Appellee,

v.

Leland L. STUDLEY,
Defendant–Appellant.

No. 88–2331.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1989.

Decided Dec. 14, 1989.

Robert T. Coleman, Asst. U.S. Atty., Thomas Daley, Laura Jones, Office of the U.S. Atty., East St. Louis, Ill., for plaintiff-appellee.

**520**

Leland L. Studley, Golconda, Ill., pro se.

Steven E. Katzman, Julie Keehner Katz, Belleville, Ill., for defendant-appellant.

Before WOOD, JR., POSNER, and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Defendant-appellant Leland L. Studley appeals from his conviction for knowingly disposing of property pledged to the Farmers Home Administration, in violation of 18 U.S.C. §§ 658 and 2. We affirm.

## I. FACTUAL BACKGROUND

Leland L. Studley and Donald Schneeman both received loans from the Farmers Home Administration and were required to pledge security.[1] Schneeman pledged a combine, a grain head, and a corn head, and Studley pledged all of his crops and cattle.[2] Financing statements concerning Schneeman's loans were filed in the County Clerk's offices in Pope and Massac Counties, Illinois. Schneeman and Studley signed security agreements containing language stating that the disposal of property pledged without permission may constitute a violation of federal criminal law.

In early December 1982, Schneeman sold some of his pledged crops to the Pillsbury Company, and, in return, received a check in the amount of $8,068 made out to the FHA and himself. Schneeman cashed the check and later, when discussing the sale with the bank president, admitted to having forged the FHA endorsement on the check.

In 1984, all of Schneeman's farm equipment, except his pledged combine, grain head and corn head, was repossessed. Studley contacted Ken Hill, the general manager for H & W Equipment Co., a farm implement dealer located in LaCenter, Kentucky, and discussed trading in Schneeman's pledged combine, grain head, and corn head. However, Studley did not inform Hill that the equipment was the property of Schneeman and pledged to the

FHA. Hill, while inspecting the equipment, made note of the serial numbers on the machines. Hill checked the County records to ascertain whether the equipment was pledged but failed to find any recorded lien since his search was limited to the name of Studley as he had no knowledge of Schneeman's financial interest in the chattel. Hill determined that the trade-in value of the equipment was $32,600 and, finding no recorded lien from his search of the records, accepted the equipment as a down payment for a new combine.

James Harris, the FHA agent who had the responsibility of making periodic checks of pledged property, learned that ownership of the combine, grain head and corn head had been transferred through a sale. A visual inspection of Schneeman's farm and an examination of a financing statement filed in the county records in Studley's name raised Harris' suspicions that the combine that belonged to Schneeman and the FHA had been traded in. In December 1984 Harris contacted H & W Equipment and was informed that the serial number on the traded-in combine was the same as that listed on the financing statement for the combine that Schneeman owned subject to an FHA financing agreement.

Harris did not speak with Studley about the combine until March of 1985, and in a discussion on March 14, 1985, Studley refused to answer Harris' question concerning the source of the down payment for Studley's newly purchased combine. Later, in that same month, Studley told Harris that he purchased the new combine with the understanding that the company would repurchase it and lease it back. Over a year later, in April 1986, Studley explained to Harris that he had traded-in Schneeman's combine, grain head, and corn head for a new four-wheel drive combine.

After Studley failed to make payments on the new combine, he agreed with Hill to return it, but strangely, when Hill attempt-

---

1. Schneeman is not a party to this appeal.

2. The terms "corn head" and "grain head" are short for "header," that means "a grain harvest-

ing machine that cuts off ... grain heads and elevates them to a wagon." *Webster's Third New International Dictionary*, 1042 (1981).

ed to retrieve the combine, he was unable to locate it as it was not at the location where Studley stated it could be found. Subsequently, Hill located the combine and repossessed it.

Thereafter, Studley and Schneeman were each indicted on one count of disposal of property pledged to the FHA, in violation of 18 U.S.C. § 658 and 18 U.S.C. § 2, in connection with the trading-in of the combine, grain head and corn head. Three additional counts of the indictment charged Schneeman with various crimes associated with his sale of the pledged soybeans and forgery of the required FHA endorsement on a check. Following trial Studley and Schneeman were convicted on all counts, were each sentenced to terms of confinement of 18 months and were jointly and severally ordered to make restitution in the amount of $32,600 within 28 months of the judgment of conviction.[3] Studley moved the court for reduction of the amount of restitution, arguing that he was unable to make the restitution payment ordered because he was indigent, and unable to earn money because of his imprisonment. The district court denied the restitution reduction motion and denied the motion for judgment of acquittal.

Studley, on appeal, argues that the district court erred in (a) denying Studley's motion for a continuance, (b) denying Studley's motion for severance, (c) denying Studley's motion in limine to suppress evidence of his earlier sale of grain through a third party, (d) allowing the government to cross-examine him concerning his renunciation of the laws of the United States, (e) ordering restitution in the amount of $32,-600, and (f) denying Studley's motion for judgment of acquittal.

## II. MOTION FOR CONTINUANCE

 Studley contends the trial court committed error in denying his motion for continuance, arguing that defense counsel needed additional time to contact witnesses and otherwise prepare a defense.

Studley was arraigned and waived his right to counsel on January 28, 1988. On February 12, 1988, Studley and co-defendant Schneeman, who also proceeded to trial pro se, filed the first of a number of motions. The court scheduled a final pretrial conference for March 1, 1988, and, upon Studley's non-appearance, a warrant issued for his arrest. On March 2, 1988, Studley appeared in court and was again advised of his right to counsel and once more waived his right to counsel, stating that he wished to proceed without representation. At this time, the court appointed attorney Steven Katzman to act as standby counsel and rescheduled the final pretrial conference for March 4, 1988. Studley and Schneeman filed a joint motion for continuance at this time, asking for additional time to review certain records and prepare a defense. The court granted the motion, moving back and rescheduling a final pretrial conference for March 31, 1988, with the trial set for April 11, 1988.

At the final pretrial conference all parties stated they were prepared for trial and the original trial date was adjourned until May 23, 1988. The court directed standby counsel to prepare jury instructions on behalf of Studley and Schneeman. On May 16, 1988, one week prior to trial, the trial judge heard standby counsel's argument on Studley's motion for a continuance. According to the transcript of the May 16, 1988, hearing on the motion, standby counsel informed the court that Studley had advised him the previous day that Studley had retained counsel to represent him during trial. Counsel explained that he did not feel he had sufficient time to line up the witnesses (lay and expert) he felt necessary to the appellant's case. The court responded:

"The Court has every confidence that you will devote the necessary time to the preparation of this case. That is why you were appointed in the first instance. As I noted earlier, I have repeatedly throughout the pretrial proceedings informed both of the defendants that I thought their interests were best protect-

---

**3.** Studley appeals his judgment of conviction.

ed by having active counsel. I warned them that a late conversion to that view and the acceptance of counsel would not be considered by this Court as grounds for a continuance.

"The Court has attempted to accommodate the defendants when they have requested continuances in the past. The Court has also attempted to accommodate standby counsel with their schedules. I would observe, Mr. Katzman, that a copy of the indictment has been readily available ever since your appointment and I'm afraid that I cannot accept that as grounds for a continuance nor the request for additional time. I realize that this will put you to some effort to line up your witnesses. But the case will go forward and your motion for a continuance is denied."

In *United States v. Bush*, 820 F.2d 858 (7th Cir.1987), we described the standard of review we apply to a district court's rejection of a motion for continuance:

"A motion for continuance is addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless there is a showing that there has been an abuse of that discretion. This issue must be decided on a case by case basis in light of the circumstances presented to the trial court at the time the request is denied."

(Citing *United States v. Uptain*, 531 F.2d 1281 (5th Cir.1976)).

Moreover,

"We have deemed the following factors highly relevant in assessing claims of inadequate preparation time: the quantum of time available for preparation, the likelihood of prejudice from denial, the accused's role in shortening the effective preparation time, the degree of complexity of the case, and the availability of discovery from the prosecution."

*United States v. Blandina*, 895 F.2d 293, 297 (7th Cir.1989) (quoting *United States v. Uptain*, 531 F.2d 1281, 1286 (5th Cir.1976)) (footnotes omitted).

Applying the *Blandina* factors, initially it should be noted that Studley played a significant role in determining the time within which counsel was required to prepare a defense. The filing of the motion for a continuance is directly attributable to Studley's insistence on proceeding *pro se* until the week before trial, despite the trial court's timely and repeated recommendation that he accept appointed counsel and its pointed admonition and warning that a decision to proceed with counsel on the eve of trial would not serve as grounds for continuance.[4] Moreover, we are of the opinion that the seven days between counsel's appointment as Studley's trial attorney and the commencement of trial was adequate time to prepare a defense, particularly since counsel should have been well aware of the facts and the applicable case law as he had been serving as Studley's standby counsel for the previous two and a half months.[5] We note also that on May 2, 1988, three weeks prior to trial, Studley's counsel, while still acting as standby counsel, was ordered to prepare jury instructions for Studley. It is beyond our comprehension how an attorney can prepare jury instructions without complete knowledge of the facts known to him and the law applicable to the case. Furthermore, we note that this was a straightforward uncomplicated single issue factual situation involving the unauthorized or fraudulent sale of FHA mortgaged property. Last, we note from our review of the record that counsel on appeal, who also represented Studley during trial, made no attempt to establish in motions during or after trial that with more time he could or would have presented any other defenses or witnesses not

4. Experienced trial judges are well aware that a legal continuance request of this nature is frequently nothing more than a stalling tactic and, if the court is so convinced, it should be treated as such by the trial court if the court is ever to make even a feeble attempt to keep a current motion and trial calendar.

5. If counsel was not prepared to go to trial on the date set for trial at the time of his acceptance of the appointment to act as standby counsel, he was required to so advise the court or refuse acceptance of the appointment. Otherwise, his actions may raise questions of professional responsibility.

presented at trial, much less how the lack of these defenses or witnesses or the denial of additional time would have affected the outcome of the trial. Therefore, Studley has failed to demonstrate prejudice from the denial of the motion for continuance. As we stated in *United States v. Rodgers,* 755 F.2d 533, 541 (7th Cir.), *cert. denied,* 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985): "Although a defendant may not be required to file a specific description of what a witness will say before he or she is interviewed, the defendant must give some indication that favorable evidence will actually be forthcoming in order to establish prejudice." We disagree with the defendant's contention regarding the court's denial of an adjournment and hold that the trial court did not abuse its discretion.

### III. MOTION FOR SEVERANCE

Studley maintains that he was prejudiced as a result of being jointly tried with Schneeman and that his trial should have been severed from Schneeman's pursuant to Fed.R.Crim.P. 14.[6]

"Rule 14 permits the trial court in the exercise of its discretion to grant separate trials when the interests of justice so require. A district court's ruling on a Rule 14 severance motion will be overturned only upon a showing of abuse of discretion. Because the balancing of the cost of conducting separate trials and the possible prejudice inherent in a single trial is best conducted by the trial court, the defendant bears an extremely difficult burden of showing on appeal that the district court abused its discretion. In order to appeal successfully the denial of a severance motion, a defendant must establish actual prejudice resulting from the denial. Actual prejudice means that the defendant could not have a fair trial without severance, ' "not merely that a separate trial would offer him a better chance of acquittal." ' [*United States v. Peters,* 791 F.2d 1270, 1301 (7th Cir.), *cert. denied,* 479 U.S. 847 [107 S.Ct. 168,

93 L.Ed.2d 106] (1986) ] (quoting *United States v. Papia,* 560 F.2d 827, 836 (7th Cir.1977))."

*United States v. Diaz,* 876 F.2d 1344, 1357 (7th Cir.1989) (quoting *United States v. Moya–Gomez,* 860 F.2d 706, 754 (7th Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989)) (footnote and citations omitted).

Furthermore, it is well settled that there is a "strong public interest in having persons jointly indicted tried together...." *United States v. Percival,* 756 F.2d 600, 610 (7th Cir.1985) (quoting *United States v. Papia,* 560 F.2d 827, 836–37 (7th Cir.1977)). As we explained in *United States v. Buljubasic,* 808 F.2d 1260, 1263 (7th Cir.), *cert. denied,* 484 U.S. 815, 108 S.Ct. 67, 98 L.Ed.2d 31 (1987):

"There is a strong interest in joint trials of those who engaged in a criminal enterprise. Joint trials reduce the expenditure of judicial and prosecutorial time; they reduce the claims the criminal justice system makes on witnesses, who need not return to court for additional trials; they reduce the chance that each defendant will try to create a reasonable doubt by blaming an absent colleague, even though one or the other (or both) undoubtedly committed a crime. The joint trial gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome."

(Citations omitted).

Initially, Studley contends that severance should have been granted because the jury could have improperly attributed the evidence presented against co-defendant Schneeman to Studley. In support of this argument he notes that Schneeman was charged in all counts of the four count indictment, alleging multiple frauds upon the FHA, while Studley was charged in only one count, alleging a single unauthorized disposal of FHA mortgaged property.

---

6. "If it appears that a defendant or the government is prejudiced by a joinder of offense or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." Fed.R. Crim.P. 14.

We recently summarized the principles governing such claims in *Diaz:*

" 'Denial of a motion for severance may be an abuse of discretion if there is a great disparity of evidence between the moving defendant and [his] codefendants.' *Moya–Gomez,* 860 F.2d at 765. But, 'the fact that the evidence against [his] co-defendants might have been proportionally greater than the evidence against [him] is not itself grounds for a severance.' *United States v. Hendrix,* 752 F.2d 1226, 1232 (7th Cir.1985). 'In such situations, the relevant inquiry is whether it is within the jury's capacity to follow the trial court's limiting instructions requiring separate consideration for each defendant and the evidence admitted against [him].' *Moya–Gomez,* 860 F.2d at 765. 'Juries, however, are presumed capable of sorting through the evidence and considering the cause of each defendant separately.' *United States v. Williams,* 858 F.2d 1218, 1225 (7th Cir.1988). In this regard, the Supreme Court has observed: 'To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions.' *Opper v. United States,* 348 U.S. 84, 95 [75 S.Ct. 158, 165, 99 L.Ed. 101] (1954)."

876 F.2d at 1357.

The trial court gave the following instructions explaining the charges of each of the defendants individually and requiring that the jury make separate findings as to each defendant's innocence or guilt as to each count charged:

"Count 1 of the indictment charges each defendant named in that count with having committed an offense.

"You must give separate consideration to each defendant in Count 1. You should return a separate verdict as to each defendant in Count 1.

"Each of Counts 2, 3, and 4 of the indictment charges the defendant, Donald R. Schneeman, with having committed a separate offense.

"Each count and the evidence relating to it should be considered separately, and a separate verdict should be returned as to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count.

\* \* \* \* \* \*

"Although the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case decided on the evidence and the law applicable to him."

We are convinced that neither the charges against Studley and his co-defendant nor the evidence presented during trial was so complex and intertwined that reasonably intelligent persons serving on the jury as voir dired before trial would be incapable of following the court's instructions and rendering a separate determination as to each defendant's innocence or guilt on each count charged against the individual defendant in the indictment. We are convinced, based upon our review of the trial testimony, including the jury instructions, that Studley's argument is nothing but unfounded speculation since it was virtually impossible for the jury to utilize the evidence against Schneeman to convict Studley. The vast majority of the evidence presented at trial concerned Studley's intent and role in disposing of Schneeman's combine. The direct evidence offered relating to Schneeman's activities under counts 2, 3 and 4 of the indictment had very little possible application to the question of intent relevant to *Studley's* activity under count 1. Further, the evidence presented on count 1 primarily concerned Studley's intent rather than Schneeman's. Thus, the phantom ofttimes alleged "spill over effect" is purely illusory, as is the defendant's speculation that the jury disregard-

ed the court's instructions and convicted the appellant based on evidence presented against his co-defendant.

Studley also argues that joinder was prejudicial because he was deprived of co-defendant Schneeman's testimony, as Schneeman exercised his Fifth Amendment right not to testify at trial. Had severance been granted, Studley submits that Schneeman would have testified on his behalf and corroborated Studley's testimony that Schneeman was unaware of the plan to sell the FHA mortgaged combine and that Schneeman and Studley had not schemed together to sell it.

■ When a defendant seeks a severance to avail himself of allegedly exculpatory testimony from a co-defendant, a trial court should consider three factors:

> "(1) whether the co-defendant's testimony would be exculpatory; (2) whether the co-defendant would in fact testify; and (3) whether the testimony would bear on defendant's case."

*United States v. Melton,* 689 F.2d 679, 686 (7th Cir.1982) (citations omitted).

> "The law in this circuit is well settled that review of the trial court's exercise of discretion in refusing a motion for severance 'must be based on the state of the record at the time of the motion.'"

*United States v. Pavelski,* 789 F.2d 485, 491 (7th Cir.), *cert. denied,* 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986) (citations omitted).

> "The mere possibility of a co-defendant's testimony is insufficient grounds for a severance." *United States v. Kord,* 836 F.2d 368, 373 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988). "To justify severance, a defendant must provide some support, such as an affidavit or recorded testimony, that his codefendant would testify in a manner which would exculpate him. Severance cannot be granted on the basis of a vague, unsupported assertion that a codefendant would testify favorably in a separate proceeding." *United States v. Andrus,* 775 F.2d 825, 847 (7th Cir.1985).

The substance of Studley's motion for severance was that a joint trial would "severely and irreparably prejudice" Studley. Studley did not allege that Schneeman would give exculpatory testimony were severance granted. He failed to make an offer of proof, and did not even present an affidavit in support of the proposition that Schneeman would give such testimony. Even now, Studley, in a feeble attempt to support his arguments, uses reverse logic and argues that "there would not be any reason" for Schneeman not to give exculpatory testimony in a trial of Studley alone. If Schneeman refused to testify in his own trial so as to not incriminate himself, why would he have testified in Studley's trial and thus subjected himself to thorough cross-examination and possibly self-incrimination? Thus, Studley has done nothing more than make a bald allegation of a mere possibility that Schneeman would give exculpatory evidence in a severed proceeding. We hold the district court did not abuse its discretion in denying Studley's motion for severance.

## IV. MOTION FOR ACQUITTAL

■ Studley contends that the district court erred in denying his motion for acquittal on the grounds that the evidence was insufficient to convict him of knowingly disposing of property pledged to the FHA, in violation of 18 U.S.C. §§ 658 and 2. Specifically, Studley argues that there was no evidence presented demonstrating his knowledge that the combine and heads were pledged to the FHA. Studley in defense, stated that he had checked the records but was unaware that the combine was pledged to the FHA. He testified that he sold the combine without Schneeman's knowledge, while Schneeman was on vacation, believing that this would be of help to Schneeman.

"In evaluating [Studley's] sufficiency of the evidence challenge, we note that [he] bears a heavy burden." *United States v. Diaz,* 876 F.2d 1344, 1351 (7th Cir.1989) (quoting *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798

(1989)). In reviewing a district court's ruling on a motion for acquittal,

> "[T]he test that the court must use is whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendant] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the Government ... bear[ing] in mind that 'it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences.'"

*United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986) (quoting *United States v. Beck*, 615 F.2d 441, 448 (7th Cir.1980)) (quoting in turn *United States v. Blasco*, 581 F.2d 681, 684 (7th Cir.), *cert. denied*, 439 U.S. 966, 99 S.Ct. 456, 58 L.Ed.2d 425 (1978)). "The inference of a defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence and circumstantial evidence is of equal probative value to direct evidence." *United States v. Towers*, 775 F.2d 184, 188 (7th Cir.1985). "'Indeed, circumstantial evidence may be the sole support for a conviction.' *United States v. McCrady*, 774 F.2d 868, 874 (8th Cir.1985)." *Marquardt*, 786 F.2d at 780. Further, "all the reasonable inferences that can be drawn from the evidence [are reviewed] in the light most favorable to the government." *Diaz*, 876 F.2d at 1351 (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir.1984)).

Schneeman had pledged the combine, the corn and grain heads to the FHA and notice of the lien, in the form of a financing statement, was on file in the proper County Clerk's offices in both Pope and Massac Counties, Illinois.[7] This financing statement properly reflected that Schneeman's farm equipment was pledged to the FHA. From 1981 to 1983 Studley had signed documents in connection with loans he had taken out with the FHA containing language advising him that disposal of

pledged property without FHA permission might constitute a violation of federal law.[8]

When Studley contacted Ken Hill about trading in the combine and the two heads, he did not inform Hill that Schneeman was the true owner and Hill's record search did not reveal the lien since, as pointed out earlier in the opinion, Hill was searching under Studley's and not Schneeman's name. Harris, the FHA agent who discovered that Studley had traded in Schneeman's pledged combine and heads for new equipment, conversed with Studley on several occasions. In March of 1985, the FHA agent asked Studley where he got the down payment for the new combine, and Studley stood mute. Later on that month, Studley implied that it was purchased with the idea that the company would repurchase it and lease it back to him. More than a year thereafter, in April 1986, Studley admitted to Harris that he traded Schneeman's pledged combine in his own name. However, he noted that he had attempted to rescind the sale after he learned the combine had been pledged to the FHA.

A reasonable jury, viewing the evidence in the light most favorable to the government, could certainly conclude that Studley's failure to inform H & W Equipment either that Robert Schneeman owned the traded-in combine or that the combine had been pledged to the FHA, from Studley's attempts to conceal this sale from FHA representatives during the year 1985 and from Studley's previous dispositions of property pledged to the FHA, that Studley knowingly disposed of property pledged to the FHA. As noted in Section V, *infra*, Studley had disposed of grain pledged to the FHA in the same manner as he had disposed of Schneeman's combine, thus demonstrating Studley's knowledge of how to dispose of property pledged to the FHA without giving notice to the FHA, in violation of 18 U.S.C. §§ 658 and 2. Accordingly, we reject Studley's sufficiency of the evidence contention and conclude that the evidence, viewed in the light most favor-

---

7. The financing statement was filed in both counties, possibly because Schneeman farmed in both counties.

8. In addition, Studley is assumed to know the law, as ignorance of the law is no defense.

able to the government, was sufficient for a reasonable jury to find beyond a reasonable doubt that Studley was guilty of knowingly disposing of property pledged to the FHA.

## V. MOTION IN LIMINE

■ The government sought to introduce evidence that Studley had on previous occasions sold grain through a third person in order to bypass the requirement of obtaining an FHA endorsement on the check that he received for the sale of the grain. Studley admitted that he did sell grain through a third person, but was of the opinion that this grain was not included under the financing statement since he obtained it as a result of a custom farming arrangement; that is, in exchange for work done on another person's farm. Studley moved *in limine* to exclude this evidence on the ground that it was "other acts" evidence and Rule 404(b) required its exclusion. The court denied Studley's motion *in limine.*

Studley alleges that the trial judge committed error in denying his motion *in limine* under Fed.R.Evid. 404(b).[9] He contends that the evidence was irrelevant because the government failed to establish that the items he sold in 1982 were pledged to the FHA. Furthermore, he argues that the probative value of the evidence, if any, was outweighed by its prejudicial effect, in that the evidence left the jury with the false impression that the 1982 sales were dishonest or illegal.

Evidence of other crimes, wrongs or acts may be admitted under Fed.R.Evid. 404(b) upon demonstration that:

"(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is suffi-

cient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice."

*United States v. Zapata,* 871 F.2d 616, 620 (7th Cir.1989). Studley, in effect, concedes that the government satisfied the first and third factors in the four-part test outlined above; and therefore, we need not address them. He directs our attention solely to the second and fourth factors, similarity of the acts and the prejudicial effect of the statement.

With respect to the second factor, Studley argues that the previous grain sale procedure was not similar to the transaction for which he was charged, as the grain involved in the previous sales was not pledged to the FHA, unlike the combine, grain head and corn head involved in the case at issue.

During the trial, Studley testified that he sold grain in another person's name to avoid having to get an FHA endorsement on the check since the purchaser of the grain would make out the check to Studley and the FHA regardless of whether or not the grain came from custom farming.

Here, the evidence of the prior grain sales was relevant to demonstrate that the defendant was familiar with the practice of selling property through third parties as a means of avoiding the requirement of obtaining FHA releases. The evidence was also relevant to demonstrate that the defendant had knowledge of how to dispose of pledged property while avoiding detection. With this in mind Studley traded in Schneeman's combine, grain head and corn head without having to reveal that Schneeman owned this farm machinery subject to an FHA lien. Studley's failure to disclose Schneeman's ownership of the farm machinery prevented Hill, the salesman of the new combine, from ascertaining that the traded-in equipment was pledged to the

9. Rule 404(b) provides:
"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

FHA. Obviously, Studley's knowledge of how to avoid the FHA notification and release procedures was probative in this case. The similarity between Studley's previous grain sales and the crime charged was that in each instance the party who had pledged property was selling the pledged property through another person in order to avoid the necessity of dealing with the FHA, and thus making the FHA aware of the fact that they were disposing of property in which the FHA had an interest without the FHA's knowledge or consent.

We now turn to Studley's contention that the probative value of the evidence of the prior grain sales was substantially outweighed by the danger of unfair prejudice. Evidence of Studley's prior grain sales was probative of Studley's method and knowledge of selling property through a third party to avoid dealing with the FHA. This evidence was certainly relevant to establish that Studley traded the combine and heads knowing that they were pledged to the FHA. Further, the prejudicial effect of the evidence, if any, was limited since the court gave clear and appropriate cautionary instructions to the jury. These instructions required the jury to consider other acts evidence "only on the question of motive, intent, knowledge and absence of mistake or accident." "Because the defendant has presented no evidence to convince us otherwise, '[w]e make the crucial and valid assumption the jurors carefully follow instructions given them by the court.'" *United States v. Shukitis,* 877 F.2d 1322, 1329 (7th Cir.1989), (quoting *United States v. Stern,* 858 F.2d 1241, 1250 (7th Cir. 1988)). Therefore, we hold that the district court did not abuse its discretion in admitting evidence of Studley's previous deceptive grain sales through a third party.

## VI. CROSS–EXAMINATION

■ Studley also alleges the trial judge committed error in allowing the prosecutor to cross examine him regarding certain written statements he made in June and August of 1985 renouncing the laws of the United States, on the grounds that the prosecutor's inquiries lacked any probative value and were extremely prejudicial.

The controversy in issue began at the commencement of trial, when the prosecutor informed the court and defense counsel of his intention to introduce two documents signed by Studley captioned "Termination of Consent" and "Revocation of Power," dated June 1985 and August 1985, respectively, wherein Studley purported to announce that he was no longer bound by the laws of the United States. Studley mailed copies of the first document, the June 1985 "Termination of Consent," to a number of federal and state governmental officials including the President of the United States, the Governor of Illinois and the Pope County, Illinois, County Clerk. It is unclear whether the second document, the "Revocation of Power," was publicly disseminated. The prosecutor urged that these two documents were probative of Studley's state of mind and intent when he committed the crime charged in the indictment. Defense counsel filed a motion in limine to exclude the evidence, arguing that his client's attempts to renounce the laws of the United States were irrelevant to his state of mind at the time of the alleged crime when he traded co-defendant Schneeman's FHA mortgaged combine, for he (Studley) made the statements more than six months after trading the combine. The trial court granted Studley's motion *in limine,* with the caveat that "the government can, of course, bring [the statements renouncing the laws of the United States] out by way of cross examination or rebuttal" if Studley "opened the door" to admission of the statements.

During direct examination, Studley testified, over the government's relevancy objection, that he was a fourth generation farmer and had served four years on submarine duty in the United States Navy. He also stated that he felt sorry for the co-defendant Schneeman after Schneeman went through a farm foreclosure in the fall of 1984, and thought "there must be something that we can do to help [co-defendant Schneeman] get back on his feet again." Studley testified that he contributed $500.00, without expectation of repayment,

toward a "holiday" for co-defendant Schneeman and his wife, and that while the Schneeman's were on vacation he came up with the idea of trading Schneeman's Gleaner combine "for something bigger and better to help Bob get back on his feet." When asked why he wanted to help Schneeman, he stated:

"Maybe it's just the Christian blood that runs in my veins or the pioneer blood; a feeling for another farmer. It's something that is just instilled in me to help my fellow man."

He also stated that he never intended to hurt anybody or to defraud the FHA when he traded Schneeman's combine and that all of his actions were in good faith.

At the conclusion of Studley's direct examination, the prosecutor argued that "the jury is left with the idea that this person is waving the banner, waving the flag ..." and had "painted a picture of goodness [and] light, so to speak, with regard to his motivations and actions here ... he has told the Court and told the jury all of these wonderful motivations that he has had when he is, in other documents, renouncing the United States government in its entire system. I think that is a relevant area of inquiry." The court, after reviewing and considering the issue, ruled in favor of the government, stating that the documents could not be introduced but that the government could inquire into the defendant's motives since the defendant gave testimony concerning the motivation for his actions.

On appeal, Studley emphasizes that his bitterness toward the government and his unilateral attempt to "revoke" his consent to the laws of the United States developed several months after he traded Schneeman's combine, in response to the foreclosure of his own farm in early 1985. He maintains that his feelings about the government during the summer of 1985 are irrelevant to his motivation or state of mind six months earlier, when he allegedly defrauded the FHA. He urges, therefore, that cross-examination on the question of his attempts to "revoke" his consent to the

laws of the United States is irrelevant and prejudicial and should have been excluded.

"The 'management of cross-examination is peculiarly committed to the district court's discretion.'" *United States v. Castro,* 788 F.2d 1240, 1244 (7th Cir.1986) (quoting *United States v. Silva,* 781 F.2d 106, 110 (7th Cir.1986)).

Rule 611(b) of the Federal Rules of Evidence, which governs the scope of cross-examination, provides:

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

Rule 608(b) provides:

"Specific instances of the conduct of a witness, for the purpose of attacking ... the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness...."

" ' "If a criminal defendant elects to testify in his own behalf, he may be cross-examined and his testimony impeached to the same extent as any other witness." ' *United States v. Kovic,* 684 F.2d 512, 515 (7th Cir.1982)." *United States v. Thompson,* 806 F.2d 1332, 1338 (7th Cir.1986). " ' 'He has no right to set forth to the jury all the facts which tend in his favor without laying himself open to cross examination.' " *Id.* (quoting *Brown v. United States,* 356 U.S. 148, 155, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958)) (quoting in turn *Fitzpatrick v. United States,* 178 U.S. 304, 315, 20 S.Ct. 944, 948, 44 L.Ed. 1078 (1900)). As the court stated in *United States v. Palmer,* 536 F.2d 1278, 1282 (9th Cir.1976):

"The range of evidence that may be elicited for the purpose of discrediting a witness is very liberal. Inquiry is permitted concerning his capacity to remember, to observe, and to recount, and for

the purpose of testing his sincerity, truthfulness and motives. This may be done with respect to subjects not strictly relevant to the testimony given by the witness on direct examination. The extent of the cross-examination is a matter within the discretion of the trial court."

The government did not inquire into this issue except during cross-examination as the court directed and required under Rules 611(b) and 608(b). Studley on direct examination stated that he had traded in the combine, together with the grain and corn heads, to help Schneeman and that his "pioneer blood" was a motivating factor in his quest to come to the aid of Schneeman. Although we recognize that Studley's attempts to renounce the United States government occurred after Studley committed the alleged criminal acts, the government's inquiry on cross-examination concerning Studley's attempts to renounce the laws of this country was relevant. Furthermore, this testimony is material in that these statements were made very near in time to the date of his alleged crime; thus he displayed his continuing anger toward the United States which might very well have been one of the motivating factors in his attempt to defraud the FHA. His (Studley's) statements reflect a "United States be damned, I will get even with them one way or another" attitude. The cross-examination was also proper since a person who feels he is no longer bound to obey the laws of the United States may very well also believe that he is no longer required to respect the solemnity of the oath administered when testifying in a court of law in the search for justice. The evidence was certainly relevant to the jury's judgment of Studley's credibility, and this relevance outweighed any possible prejudice to Studley.

■ We have recognized that the fact that Studley's alleged criminal acts predated his attempts to renounce the United States Government may limit the relevance of the evidence of these attempts to renounce the government. However, even if we were to conclude, which we do not, that the court committed error in permitting the cross-examination on the subject of Studley's attempts to renounce the government, we would still be required to determine whether or not the error was reversible. In examining whether a trial court error that does not violate the Constitution requires reversal, we apply

> "[t]he 'substantive rights' or 'substantial rights' standard [that] stems from Federal Rule of Criminal Procedure 52(a) which states that:
>
> > 'Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.'

Unlike the harmless error standard, the government is not required to demonstrate that the error was harmless beyond a reasonable doubt. Rather, the government must establish only that the error had no 'substantial influence on the verdict.' *United States v. Kotteakos,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). The Supreme Court in *Kotteakos,* 328 U.S. at 764–65, 66 S.Ct. at 1247–48, explained the standard in the following manner:

> 'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phrase affected by the error. It is rather, even so, whether the error itself had substantial influence.' (Footnote and citation omitted)."

*United States v. Grier,* 866 F.2d 908, 920 (7th Cir.1989). The cross-examination concerning Studley's attempt to renounce the United States Government was minimal, consisting simply of a few questions regarding whether Studley had signed the

two documents purporting to renounce the government. Furthermore, as detailed in section IV, *supra,* there was overwhelming evidence of Studley's guilt of the crime of disposal of property pledged to the FHA. Thus, based upon the limited amount of cross-examination permitted on the subject of Studley's attempts to renounce the government and the overwhelming evidence in the record of Studley's guilt of the crime alleged, we conclude even if there was error as related to the scope of cross-examination, which we do not believe there was, the error fails to rise to the level of a reversible error because it did not have a "substantial influence on the verdict" in this case.

## VII. RESTITUTION

■ Studley also contends that the trial court abused its discretion in ordering that he make restitution in the amount of $32,600 during the time period set forth in the order.[10] Studley contends that he is indigent and will be unable to earn money during the eighteen-month payment time span directed because he will be incarcerated during that period pursuant to the sentence imposed.[11]

We have consistently held that:

"A sentence which is within the limits established by statute under which it is imposed will not be vacated upon review unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence."

*United States v. Vega,* 860 F.2d 779, 800 (7th Cir.1988) (citations omitted). These rules of deference apply, as well, to restitution orders under the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3663

*et seq.* ("VWPA"). *United States v. Mahoney,* 859 F.2d 47, 49 (7th Cir.1988). Nevertheless, as we explained in *Mahoney:*

"Despite the fundamental need for appellate deference to trial court sentencing decisions, sentencing statutes such as the VWPA impose important substantive and procedural limitations on the trial judge's discretion ... [and] the 'VWPA implicitly requires the district judge to balance the victim's interest in compensation against the financial resources and circumstances of the defendant—all while remaining faithful to the usual rehabilitative, deterrent, retributive, and restrictive goals of criminal sentencing.' "

*United States v. Mahoney,* 859 F.2d at 49 (quoting *United States v. Bruchey,* 810 F.2d 456, 458 (4th Cir.1987)). *See also United States v. Peden,* 872 F.2d 1303, 1310 (7th Cir.1989).

Section 3664(a) provides:

"The Court, in determining whether to order restitution under Section 3579 [renumbered as § 3663] of this Title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependence, and such other factors as the court deems appropriate."

The question Studley raises is whether the trial court considered his financial resources, needs and earning ability, as § 3664(a) requires.[12] As we noted in *United States v. Peden,* 872 F.2d 1303, 1310–11 (7th Cir.1989):

"The imposition of restitution under the Victim and Witness Protection Act requires that the court consider 'the finan-

---

**10.** The restitution order made Studley and Schneeman jointly and severally liable for this amount.

**11.** The trial court sentenced Studley to a prison term of eighteen months, and specifically ordered at the sentencing hearing that restitution be made within eighteen months of the sentencing date, rather than upon completion of the prison term, thus making it impossible for him to comply with the court order in the absence of other funds, i.e., inheritance, family financial

help, etc. at his disposal which are undisclosed in the record.

**12.** Studley does not contend that the trial court failed to consider the amount of loss sustained by the victim—the FHA—or the financial needs and earning ability of his dependents. Therefore, we need not reach these issues, and we note that the record fails to disclose that Studley has any dependents.

cial resources of the defendant, [and] the financial needs and earning ability of the defendant....' 18 U.S.C. § 3580(a). Such consideration is mandatory when imposing restitution under the Act. *United States v. Gomer*, 764 F.2d 1221, 1222 (7th Cir.1985)." [13]

We have held that "where the defendant charges that the district judge failed to consider a mandatory sentencing factor [such as the defendant's financial needs, resources and earning ability] the appellate court must reverse where the defendant shows either (1) that the judge explicitly repudiated the mandatory factor, or (2) that it was not improbable that the judge failed to consider the mandatory factor and was influenced thereby." *United States v. Gomer*, 764 F.2d 1221, 1223 (7th Cir.1985).

During the sentencing hearing, defense counsel never mentioned, much less discussed, the propriety of restitution or any of the factors listed in § 3664(a), arguing only that Studley should not be sentenced to a prison term. For its part, the government recommended that Studley be found jointly and severally liable with Schneeman to make restitution in the amount of $32,-600—the amount the district court eventually imposed—because according to the government, the amount is equal to the value of Schneeman's combine when Studley traded it. The trial judge ruled, without specifically mentioning or discussing any of the factors listed in § 3664(a), such as the defendant's financial resources, needs, earning ability, and the defendant's dependents' financial needs and earning ability, that Studley and/or Schneeman make restitution of $32,600 to the FHA within eighteen months of the sentencing hearing. We wish to point out that the judge did state on the record that he would entertain a motion to extend the time of payment beyond eighteen months. But, this mere mention of the possibility of extension of time, without consideration of supporting data such as the financial needs and earning ability of the defendant and his family, is insufficient under the statute.

*See Peden*, 872 F.2d at 1310–11; *Mahoney*, 859 F.2d at 49–52. Subsequently Studley filed a motion for reduction of sentence, requesting that the court eliminate or reduce the amount of restitution ordered, or allow Studley additional time to make the payment. The district court denied the motion, stating only that "the court further finds nothing in the record which would warrant at this time its eliminating or reducing the amount of restitution or in extending the amount of time defendant has to make restitution." The court did not address the salient question of how this defendant could possibly make restitution payment while confined in prison.

The district court failed to mention, much less apply, the factors, such as the defendant's financial resources, financial needs or earning ability, set forth in § 3664(a), either during the sentencing hearing or in his denial of Studley's motion for reduction of sentence. Thus, this case is analogous to *United States v. Peden*, 872 F.2d 1303, 1311 (7th Cir.1989), where we agreed with the defendant's contention

"that the district court failed to comply with the procedures for imposing restitution under the Victim and Witness Protection Act, and abused its discretion in imposing the stated amount of restitution without taking into consideration the defendant's ability to pay after considering his debts and obligations, as well as those of his family."

As we noted in *Peden:*

"We emphasize that unless the defendant stipulates to the amount of restitution proferred and his ability to pay that amount, the district judge must conduct a hearing to consider the propriety of the amount of restitution, in addition to determining the defendant's obligations, debts, and ability to pay."

872 F.2d at 1311. We have little choice but to conclude, based upon the record before us, that it was not only improbable but highly probable that the court failed to

---

**13.** 18 U.S.C. § 3580, referred to in the quotation, was renumbered 18 U.S.C. § 3664, effective November 1, 1986.

consider Studley's financial resources, financial needs, earning ability, or family needs and that the court's failure to consider these factors influenced its judgment. Our conclusion finds support in the restitution order itself, as we are at a loss to understand, based on the record before us, how Studley could possibly raise the $32,600 during his eighteen-month confinement following the imposition of sentence. The record reflects that Studley's farm is in foreclosure, that the court had previously declared him indigent when it appointed counsel on his behalf, and that he is sentenced to prison for the entire eighteen month period within which restitution is to be made. Of course, Studley may be paroled prior to the expiration of the eighteen month payment period, but the district court failed to mention or discuss whether Studley would receive parole and his anticipated earning capacity, if any, at the time of release.

We were confronted with similar situations in both *United States v. Mahoney*, 859 F.2d 47 (7th Cir.1988) and *United States v. Peden*, 872 F.2d 1303 (7th Cir. 1989). In *Mahoney* the district court ordered that the defendant make full restitution of over $288,000 within a five-year period. The record established that the defendant earned $600.00 per week, with which he supported himself and his dependent wife. Upon review of the record, we concluded that the district court had failed adequately to explain "how this defendant, a man without any tangible assets and a $30,000 annual salary—will somehow be able to repay a debt totally more than nine times his annual salary in five years." *Mahoney*, 859 F.2d at 47. In *Peden* the district court ordered that the defendant make restitution in the amount of $84,225.06, representing the amount of a loan and interest that Peden secured as a result of making a false statement to a federally insured bank. We concluded that the district court "abused its discretion in imposing the stat-

ed amount of restitution without taking into consideration the defendant's ability to pay after considering his debts and obligations, as well as those of his family." 872 F.2d at 1311.

As in *Mahoney* and *Peden*, the district court in this case failed to explain, and thus even consider, whether Studley's financial resources and earning ability would allow him to comply with the restitution order the court imposed.[14] As we explained in *Mahoney*,

"at the time the court orders restitution it is most paramount that the defendant, in the all-important rehabilitative process, have at least a hope of fulfilling and complying with each and every order of the court. Thus, an impossible order of restitution, as made in this case, is nothing but a sham, for the defendant has no chance of complying with the same, thus defeating any hope of restitution and impeding the rehabilitation process."

*Id.* at 52.

Accordingly, we vacate the district court's order of restitution, and remand to the district court with directions to conduct a hearing to consider the factors of the defendant's and the defendant's dependents' financial resources, financial needs and earning ability set forth in 18 U.S.C. § 3664(a) and order restitution pursuant thereto.

## VIII. CONCLUSION

The defendant's arguments in favor of reversing his conviction are without merit. The district court properly denied Studley's motion for continuance. Studley's delay in hiring counsel was the primary factor in reducing his counsel's preparation time and Studley has failed to demonstrate prejudice. After reviewing the record, we are convinced that the trial court is not guilty of an abuse of discretion in denying Studley's motion for severance. The alleged

**14.** The government contends that the trial court did not err since "the burden of demonstrating the financial resources of the defendant" is on the defendant. 18 U.S.C. § 3664(d). While it is true that the defendant bears the burden, we note that the record contains several references to Studley's lack of financial resources and that the trial court failed to conduct a hearing to discharge its responsibilities under § 3664(d).

spillover effect was illusory and Studley has failed to allege more than the mere possibility that Schneeman would have given exculpatory testimony. Likewise, we are of the opinion that the court also did not abuse its discretion in denying Studley's motion *in limine* to exclude other acts evidence since the evidence of Studley's prior grain sales through a third party met the requirements of the four-part *Zapata* test. Furthermore, we are convinced that the court did not abuse its discretion in allowing the government to cross-examine Studley concerning his statement purporting to renounce the laws of the United States, as the cross-examination dealt almost exclusively with the credibility of Studley and was admissible under Rule 611(b) of the Federal Rules of Evidence. The district court properly denied Studley's motion for acquittal since there was sufficient evidence to convict him of knowingly disposing of property pledged to the FHA. As recited earlier, we hold that the district court committed error in ordering that Studley make restitution without considering his financial resources, financial needs or earning ability as required under 18 U.S.C. § 3664(a). We remand to the district court only for the purpose of conducting a hearing to consider the factors of the defendant's and the defendant's dependents' financial resources, financial needs and earning ability set forth in 18 U.S.C. § 3664(a) and to order restitution pursuant thereto.

AFFIRMED IN PART; VACATED IN PART; CAUSE REMANDED.