32 F.3d 570
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Eric JACKSON, Defendant-Appellant.
 No. 93-2035.
 United States Court of Appeals, Seventh Circuit.
 Argued April 20, 1994.
Decided Aug. 12, 1994.
 
 Before POSNER, Chief Judge, and RIPPLE and KANNE, Circuit Judges.
 
 ORDER
 
 1
 Eric Jackson and Tony Varela were drug dealers. They met in 1988, and during that year Jackson twice bought two kilograms of cocaine from Varela for $20,000 per kilogram. Jackson found a cheaper supplier soon thereafter, and he did not contact Varela for three years.
 
 
 2
 In December of 1991 Jackson arrived at Varela's house. He asked Varela to sell him twenty-five pounds of marijuana. Varela told Jackson to call him back to discuss a possible sale. Unknown to Jackson, Varela had been arrested by the Drug Enforcement Agency and was now cooperating with them. He informed the DEA that he had been approached by Jackson. Jackson called back, and his conversation was recorded, and Varela told him that he would have to contact a friend about getting the marijuana. Jackson never followed up on this offer.
 
 
 3
 Jackson again arrived unexpectedly at Varela's house in June of 1992. The men spoke on the front porch. Jackson offered to sell Varela a kilogram of cocaine for $34,000. Varela told Jackson that he had a friend who could buy the kilogram. Varela then called his "friend" who was actually a DEA agent. Varela told Jackson that his friend would call back.
 
 
 4
 DEA agent Tovar returned Varela's call. The conversation was recorded. Varela told him that Jackson was there and ready to talk to him. Varela then gave the phone to Jackson, who offered to sell the cocaine to Tovar. Jackson and Varela agreed to meet with Tovar, who was posing as "Alejandro", at the Omni store in Melrose Park, Illinois at about 1:30 P.M. that day.
 
 
 5
 By 1:30 Varela and Tovar were waiting in the parking lot in Tovar's car. There were other agents in the area, as well. Varela called Jackson on his car phone. Jackson said that he would be there at about 2:30, and that he had the cocaine. He asked if Varela had the money, and Varela said he did.
 
 
 6
 Jackson drove into the Omni parking lot around 2:30 P.M., slowed down, and apparently not seeing Varela, drove out of the lot. In the car with him was another man named Wells. He drove to a nearby McDonald's restaurant. Varela paged Jackson, who then called Varela. In a recorded conversation Jackson told Varela he hadn't seen him in the parking lot, and that wanted to do the deal at the McDonald's because the Omni lot looked too dangerous. Varela refused, and said that the McDonald's was too dangerous.
 
 
 7
 Jackson drove back to the Omni lot, without Wells. Varela walked up to Jackson's car. Their conversation was recorded. Jackson reiterated that he did not like the Omni parking lot, and Varela told him it was safe. Varela said that his friend had the money and asked Jackson if he had the cocaine. Jackson said he did not, but that it was "right around the corner." Varela offered to show Jackson the money.
 
 
 8
 Varela then left for Tovar's car, and shortly thereafter the two of them returned to Jackson's car with the money. Varela introduced Tovar as "Alejandro." Tovar asked Jackson if he had the cocaine, and Jackson told him it was around the corner with a friend. Jackson asked Tovar if he had the money. Tovar showed him $28,000 in cash. Jackson complained because the entire $34,000 wasn't there and Tovar replied that he hadn't seen any cocaine yet.
 
 
 9
 Jackson then reached out of the car window and tried to grab Tovar, apparently looking for a "wire," which is a concealed recording apparatus. Tovar then said "Oh, forget it, let's just go" and walked back to his car. Varela told Jackson to bring the cocaine to him, and would give it to Tovar and bring the money back to Jackson. Jackson asked Varela to drive to the McDonalds with him, but Varela refused, saying he didn't want to leave his friend. Jackson drove away to get the cocaine, and Varela walked back to Tovar's car.
 
 
 10
 Jackson returned with Wells in the car. Varela walked over to his car. Jackson told Varela that he did not want to go through with the sale because he thought the parking lot was dangerous. But he showed Varela the cocaine anyway. Upon seeing it, Varela gave a signal, and the DEA agents began moving in to arrest Jackson.
 
 
 11
 Jackson sped out of the parking lot, and after a high speed chase, crashed his car. Jackson and Wells were both arrested.
 
 
 12
 Jackson was indicted with one count of conspiring with Wells to possess one kilogram of cocaine with intent to distribute, and one count of possessing with intent to distribute. Wells was also charged with conspiracy and possession. Both defendants pled not guilty. The government filed notice with the court that it planned to introduce evidence of Jackson's prior drug deals with Varela under Rule 404(b) as probative of Jackson's intent and of the relationship of trust existing between him and Varela. The government also moved in limine to restrict the scope of cross-examination of Varela regarding his background and prior record.
 
 
 13
 Jackson testified in his own defense at trial. The essence of his claim was that he was not really engaging in a drug deal with Varela, but was cooperating with Varela because he owed Varela money and was afraid of him. The jury heard Jackson's version of the facts and by convicting him demonstrated that they rejected it. It found Jackson guilty of possession, and not guilty of conspiracy. Wells was found not guilty on both counts. On April 22, 1993 Jackson was sentenced to 151 months incarceration. He now appeals his conviction and sentence.
 
 
 14
 Jackson argues that the district court (1) abused its discretion by limiting cross examination of Varela and limiting the introduction of extrinsic evidence regarding various of Varela's prior "bad acts" during cross-examination (2) abused its discretion by allowing the government to cross-examine Jackson regarding his earlier drug deals with Varela, and (3) erred in its factual finding that Jackson perjured himself and was thus subject to a two-level sentencing adjustment, and that the district court had an inadequate factual basis apply the increase for reckless endangerment.
 
 Limitations on Cross-Examination of Varela
 
 15
 Jackson wanted to introduce evidence that (1) Varela had told a DEA informant that he arranged to steal cocaine from other drug dealers and kill any witnesses, (2) Varela solicited another DEA informant to steal 100 kilograms of cocaine from a car, and that he would kill the driver if necessary, and (3) that a Detective in Maywood had informed the DEA that a body had been found in Maywood and that it was "common knowledge in the Hispanic community" that Varela was responsible for the death.
 
 
 16
 The government moved in limine to preclude cross-examination of Varela on these matters, and Jackson responded that it was premature to rule on the motion prior to the direct examination of Varela. After Varela's direct examination, there was a sidebar conference. The government noted that it had not opened the door to the alleged prior bad acts, and that they were not probative of Varela's veracity, and hence not admissible under Rule 608(b). Jackson's counsel argued that the prior bad acts were part of Jackson's claim that he was coerced to cooperate with Varela, and that Varela had in the past acted in the same way Jackson accused him of doing.
 
 
 17
 The district court decided to wait until after Jackson testified before ruling on whether to allow cross examination of Varela on his alleged prior bad acts. After the examination of the defense witnesses, Jackson's counsel moved to recall Varela. The district court denied the motion, finding that Jackson was trying to show that "in the past Varela had used threats" and that this was propensity evidence which must be excluded.
 
 
 18
 The scope of cross-examination is governed by Federal Rule of Evidence 611(b),[1] which limits it to (1) the subject matter of the direct examination and (2) the witness's credibility. Rule 608(b) limits the use of specific instances of the witnesses conduct for the purposes of attacking his credibility on cross-examination.[2] We review the district court's decision to limit cross-examination for abuse of discretion. United States v. Torres, 965 F.2d 303, 310 (7th Cir.1992) (The district court has wide discretion to limit cross-examination, and we review for abuse of discretion).
 
 
 19
 None of the alleged prior acts of Varela had resulted in an arrest or conviction, so they were not admissible on that basis to be raised on cross examination. Nor were the alleged acts the type which necessarily demonstrate a propensity to lie. See, e.g. U.S. v. DegGeratto, 876 F.2d 576, 582-84 (7th Cir.1989) (cross examination regarding involvement in prosecution not proper for impeachment of defendant accused of theft, mere "bad act" not probative of credibility). The district court did not abuse its discretion when it determined that the Varela's alleged acts were not admissible on cross-examination to attack his credibility.
 
 
 20
 The district court also properly denied the introduction of extrinsic evidence in the form of testimony by law enforcement personnel regarding their suspicions that Varela had committed various prior bad acts. Rule 608(b) forbids the introduction of extrinsic evidence of "specific instances of conduct" to attack credibility, other than convictions of crimes. So, 608(b) forbids introduction of the evidence.
 
 
 21
 Nor is the extrinsic evidence admissible under Federal Rule of Evidence 404(b), as Jackson argues. We set out a four part test to determine whether evidence is admissible for purposes of Rule 404(b) in United States v. McAnderson, 914 F.2d 934, 945 (7th Cir.1990).[3] Jackson fails the test. For instance, the evidence was without question inadequate to meet the third prong, the requirement that it be sufficient to support a jury finding. The evidence also fails the first prong. Jackson wanted to demonstrate that because Varela was violent in the past he might be violent again, thereby supporting his claim that he was intimidated by Varela. This is a pure propensity argument and it is disallowed.
 
 
 22
 Jackson also makes an argument that the extrinsic evidence of Varela's allegedly violent behavior was admissible as evidence to prove "motive, plan, or modus operandi." But the invocation of this exception to 404(b) avails Jackson nought. Generic allegations that Varela has in the past employed and threatened to use force in his illegal dealings are not the type of idiosyncratic conduct which qualifies as a modus operandi. Nor do they indicate any particular motive or plan with regard to Jackson. The district court did not abuse its discretion when it refused to allow the introduction of the extrinsic evidence during Varela's cross-examination.
 
 Cross-Examination of Jackson
 
 23
 Jackson objects to being cross-examined regarding his prior criminal activity. Jackson chose to take the stand, and is thus subject to cross-examination "to the same extent as any other witness." United States v. Studley, 892 F.2d 518, 529 (7th Cir.1989).
 
 
 24
 Jackson opened the door to the cross-examination he endured. On direct examination he lied about the length of his prior sentence for check-forging, about the circumstances surrounding the check forging, and he lied when he said he successfully completed his probation without violating any federal or state laws. We have held that on cross examination "inquiry is permitted" to discredit a witness by challenging the truthfulness of his testimony. Id. The cross-examination of Jackson on matters he raised in his direct testimony challenged the truthfulness of that testimony. There was no abuse of discretion in allowing such cross-examination.
 
 
 25
 Jackson objects to the use of wiretap evidence, which indicated his involvement in other, prior crimes in Florida. He objects that this evidence is not admissible because it is a violation of Rule 404(b) which provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of person in order to show that he acted in conformity therewith. However, the next sentence mentions that it may be admissible "for other purposes." In this case the evidence was used for an allowed "other purpose."
 
 
 26
 In United States v. Murzyn, 631 F.2d 525, 529, n. 5 (7th Cir.1980), we noted that "if the accused asserts he was subtly coerced by threats or intimidation, evidence of the accused's character is relevant to show whether or not he was likely to have been influenced by such pressures." This is exactly what Jackson asserts, and the evidence is relevant to rebut his coercion defense, such evidence is not restricted to entrapment cases, and is not barred by rule 404(b).[4]
 
 Sentencing
 
 27
 Jackson argues that it was clear error for the court to find that he had perjured himself, and thereby incur a two level adjustment of his sentence for obstruction of justice. U.S.S.G. Sec. 3C1.1, Application note 3. The court's finding of obstruction is a finding of fact, reviewable only for clear error. United States v. Carson, 9 F.3d 576, 583 (7th Cir.1993).
 
 
 28
 The Supreme Court recently defined perjury, in this context, as "a witness testifying under oath ... giv[ing] false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Dunnigan, 113 S.Ct. 1111, 1116 (1993). In United States v. Carson, 9 F.3d 576, 584 (7th Cir.1993), the trial court found, based on its own consideration of the evidence of the entire trial, that the defendant's testimony was false. We held that this finding "sufficiently encompassed the factual predicates required by Dunnigan." id. In United States v. Severson, 3 F.2d 1005, 1012 (7th Cir.1993) we noted the necessity of a "separate and clear finding" of a willful lack of truthfulness in a material matter to impose the enhancement. In this case, the trial court made such a finding. After hearing Jackson testify the trial judge stated that he "didn't buy it" and that the testimony was "sufficiently variant from the truth" to justify the increase.
 
 
 29
 In United States v. Emenogha, 1 F.3d 473, 482 (7th Cir.1993), the district court found the defendant's testimony to be "untruthful" and "utterly incredible." We held this to be a sufficient finding. In this case the district court judge stated that the defendant's testimony was "preposterous." The adjectives are different, but the outcome is the same. There was no error in applying the two level adjustment.
 
 
 30
 Jackson also claims that "the judge was not in a position to be fair and impartial" in applying the enhancement for reckless endangerment. This is the result, he claims, of the "excessive" cross-examination of him engaged in by the government, and the limitations on the cross-examination of Varela. The essence of this argument is that Jackson did not know he was being chased by the law enforcement officers, so he did not fall within the requirements of U.S.S.G. 3C1.2, Reckless Endangerment During Flight.
 
 
 31
 However, the recorded conversations show Jackson continually making reference to being afraid of going to prison. He was nervous in the Omni parking lot because he was afraid of being arrested. Also, during pursuit by the police vehicles an officer pulled alongside Jackson's car and showed Jackson his badge. Jackson then accelerated away and sped away. There was sufficient evidence for the district court to conclude that Jackson knew he was being pursued by law enforcement officers. Therefor, application of the Reckless Endangerment adjustment was proper.
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of its discretion, permit inquiry into additional matters as if on direct examination
 
 
 [2]
 Specific instances of the conduct of a witness, for purposes of attacking ... the witness' credibility, other than conviction of a crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness
 
 
 [3]
 The McAnderson test states that prior bad acts may be admitted when:
 (1) the evidence is directed toward establishing a matter in issue other than the witnesses propensity to commit the acts in issue;
 (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue;
 (3) the evidence is sufficient to support a jury finding that the witness committed the similar act; and
 (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.
 
 
 [4]
 Jackson also claims that the district court failed to balance the prejudicial effect of the evidence against its probative value as required by Rule 403. But in U.S. v. Alvarez, 833 F.2d 724, 727 (7th Cir.1987), in applying the identical balancing test of Rule 609, we noted that while a specific finding is preferable, an implicit finding is not an abuse of discretion. In Alvarez the trial judge "asked the prosecutor to define the purpose" of the evidence, and provided the defense a chance to respond and point out the potential prejudicial effect. The judge in this case did the same. In Alvarez the judge cautioned the jury not to use the evidence to determine the defendant's guilt or innocence. In this case the jury was so instructed before retiring to deliberate. Compliance with the Rule 403 requirement of a balancing test was sufficient. There was no abuse of discretion